UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                              )
AMBAC ASSURANCE CORPORATION,                  )
                                              )
                              *Plaintiff*,    )    No.
              v.                              )
                                              )    **COMPLAINT**
U.S. BANK NATIONAL ASSOCIATION,               )
                                              )
                              *Defendant*.    )
———————————————————————       )

 

Plaintiff Ambac Assurance Corporation ("Ambac"), by and through its attorneys

Patterson Belknap Webb & Tyler LLP, for its complaint against Defendant U.S. Bank National

Association ("U.S. Bank"), Trustee of the Harborview Mortgage Loan Trust 2005-10

("Harborview 2005-10" or the "Trust"), alleges as follows:

## NATURE OF THE ACTION

1.     This action arises out of U.S. Bank's duties as the Trustee of Harborview

2005-10, a residential mortgage-backed securities ("RMBS") trust backed by loans originated by

Countrywide Home Loans, Inc. ("Countrywide").  Because an event of default, as defined in the

Trust's governing documents, has occurred, U.S. Bank as Trustee is obligated to conduct itself

like a prudent person managing his or her own affairs, and it owes fiduciary duties to Trust

beneficiaries, including Ambac.

2.     In violation of its contractual and common law duties, U.S. Bank entered

into a settlement on the Trust's behalf that, when it becomes effective, will release the Trust's

valuable claims against Countrywide and its successors Bank of America Corporation and Bank

of America N.A. (together, "Bank of America") for a fraction of their true value, causing Ambac

to lose millions of dollars it would otherwise receive.  As described in detail in the pages that

follow, no prudent person or fiduciary would settle such valuable litigation claims for the amount reflected in the settlement.

3.      U.S. Bank compounded the harm to Ambac by floundering when faced with making decisions about the Trust and the litigation as it sought to prioritize its own individual interests over the best interests of the Trust and its beneficiaries.  U.S. Bank agreed to stay the Trust's litigation against Countrywide and Bank of America in early 2017, then insisted on filing a court proceeding in Minnesota to shield itself from liability, then determined to *reject* the proposed settlement but incomprehensibly continued to stay the Trust's litigation against Countrywide for over a year, even though discovery had been substantially completed and the parties were ready to file summary judgment motions and proceed to trial.  U.S. Bank's inexplicable decision to stay the case—even when no acceptable settlement offer was imminent—diminished the value of the Trust's claims and weakened the Trustee's negotiating position with Countrywide and Bank of America.  U.S. Bank caused further harm by filing a pointless trust instruction proceeding in Minnesota that sought no relief, spending hundreds of thousands of dollars on legal fees that are billed to the Trust.

4.      U.S. Bank's conduct is unfathomable when viewed from the perspective of the Trust and its beneficiaries:  at every turn, U.S. Bank has acted in ways that devalue rather than protect the Trust's assets, including its breach of contract claims against Countrywide and Bank of America, worth hundreds of millions of dollars.  U.S. Bank's true motivation has been to avoid, at all costs, permitting a court in this District to determine the key contractual question of whether an event of default exists under the Trust's governing agreements, an occurrence that is transformative for the Trustee and dramatically enhances the duties it owes to Trust beneficiaries.

10420671

5.      Desperate to avoid a ruling that it must act prudently and as a fiduciary, which has the potential to ripple through other litigation where U.S. Bank is a defendant, U.S. Bank has taken every step imaginable to convince the courts in this District and in Minnesota to turn a blind eye to its misconduct over the past year and a half and bless the paltry settlement from Countrywide and Bank of America without scrutiny of U.S. Bank's true motivation.  In its extraordinary contortions to avoid any finding on the event of default issue, U.S. Bank has incurred significant costs on attorneys and experts, and billed those wasteful expenses to the Trust even though they were incurred solely to shield U.S. Bank from liability.  But U.S. Bank's gamesmanship will ultimately prove insufficient to insulate it from the consequences of attempting to protect its own interests at the expense of Ambac and other Trust beneficiaries. This suit seeks to recover damages to compensate Ambac for the harm caused by U.S. Bank's breaches of duty.

*                    *                    *

6.      Ambac is a financial guaranty insurer, sometimes called a "monoline" insurer, that issued a financial guarantee insurance policy (the "Policy") to the Trust for the benefit of certain classes of certificateholders.  Under the Policy, when the Trust suffers a shortfall in cashflows from the underlying mortgage loans that affects the insured certificates, Ambac will step in and make payments to the insured certificateholders.  Ambac's risk of having to make a payment under the Policy, therefore, depends on the creditworthiness of the underlying mortgage loans.

7.      Like many RMBS transactions, Harborview 2005-10 has suffered staggering losses since it closed on August 31, 2005, causing Ambac to make nearly $80 million of insurance claims payments.  The reason for the Trust's abysmal performance is now clear:

10420671

Countrywide systematically abandoned its underwriting guidelines and critical quality assurance policies in the lead-up to the financial crisis, originating imprudent loans to borrowers who lacked the ability or willingness to repay their debt.  As these borrowers defaulted or became delinquent on their mortgage payments, the cashflows into the securitization became insufficient to make scheduled principal and interest payments to certificateholders, and Ambac, as well as holders of uninsured certificates, suffered enormous losses.

8.     Ambac and certificateholders, however, are not without recourse against Countrywide and Bank of America.  Under Harborview 2005-10's governing contracts, Countrywide is obligated to repurchase any loan that does not comply with the dozens of representations and warranties it made for the Trust's benefit.

9.     U.S. Bank, as Trustee, is required under the Trust documents to enforce Countrywide's obligations to make the Trust whole.  Moreover, because the Trust has suffered a contractually defined "Event of Default," U.S. Bank must do more than simply abide by the terms of the contract:  it must exercise the skill and care of a prudent person in maintaining Trust assets, and it undertakes robust fiduciary duties to Trust beneficiaries.

10.     U.S. Bank initially enforced Countrywide's obligations by filing suit against Countrywide and Bank of America in New York state court, seeking damages for Countrywide's massive contractual breaches.  In that litigation, U.S. Bank has made sweeping, detailed, and damning allegations about Countrywide's mortgage origination practices and the shoddy loans that it originated and that were included in this transaction.  For example, U.S. Bank alleged that Countrywide ignored its mortgage representations in pursuit of profit and market share and that it "purposefully and knowingly: (a) manipulate[ed] the data in the Loan Files in order to facilitate approval of the Loan; (b) blatantly ignor[ed] significant and repeated

10420671

discrepancies in the Loan Files and Loan applications; [and] (c) fail[ed] to comply with the mandatory checks required by Countrywide's own automated underwriting program."  Fourth Amended Complaint ("Fourth Am. Compl."), *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. N.Y. Cty.), NYSCEF No. 371, ¶¶ 47-49, 53.  U.S. Bank alleged that a review of loans in the Trust "demonstrate[s] Countrywide's large scale failure to abide by its underwriting guidelines in originating the Loans."  *Id.* ¶ 73.

11.    In the litigation, U.S. Bank alleged that Countrywide and Bank of America exhibited a "pattern and practice of refusing to abide by their unambiguous obligation to repurchase Defective Loans."  *Id.* ¶ 78.  In connection with expert discovery, U.S. Bank hired an expert in loan reunderwriting to examine a statistically significant random sample of liquidated loans in Harborview 2005-10.  That expert found that *87% of the loans in the sample* breached Countrywide's representations and warranties.

12.    Before it inexplicably stayed the litigation, U.S. Bank and its counsel had done a commendable job prosecuting the Trust's valuable claims against Countrywide and Bank of America, strengthening the case for briefing on summary judgment and trial.  Over the course of more than five years of hard-fought litigation, U.S. Bank has spent many millions of dollars of Trust assets prosecuting these claims on behalf of the Trust.

13.    In late 2016, however, U.S. Bank received notice that a small percentage of certificateholders had negotiated a Trust-wide settlement with Countrywide and Bank of America, and U.S. Bank responded by agreeing to stay the New York litigation on the eve of filing a note of issue and certificate of readiness for trial.  Ambac promptly responded by filing suit to enjoin U.S. Bank from accepting the lowball offer because acceptance would breach U.S. Bank's heightened post-Event of Default obligations to Trust beneficiaries.  When U.S. Bank

5

eventually agreed with Ambac that the settlement was inadequate and should be rejected, Ambac's suit was dismissed for lack of justiciable controversy.

14.     Now, however, without any advance notice to Ambac or other certificateholders, U.S. Bank has accepted a paltry settlement offer from Countrywide and Bank of America that would require the Trust to release all of its claims in exchange for a $94 million payment, a mere fraction of the losses that Countrywide and Bank of America will be exposed to at trial.  The settlement harms Ambac by depriving it of the funds that it would receive as reimbursement for past claims if the Trust obtained a judgment or settlement for an amount commensurate with their value.

15.     No prudent person or fiduciary would accept such an inadequate settlement.  Applying the 87% breach rate found by U.S. Bank's own expert to the $373.6 million in collateral losses suffered by the Trust to date yields over $325 million in damages. The proposed settlement consideration is barely 28% of the damages that the Trust would be entitled to recover based on U.S. Bank's own expert's analysis.  While litigation entails risks and settlements should reflect those risks, no prudent person managing his or her own affairs would settle an RMBS representation and warranty case with an 87% breach rate and a damages claim of more than $325 million for less than a third of its value.

16.     U.S. Bank's actions leading up to the settlement diminished the value of the Trust's claims and demonstrate that U.S. Bank's primary interest is in protecting itself from adverse legal rulings.  It agreed to a stay of the New York action for *nearly a year and a half*, even when U.S. Bank acknowledged that the settlement offers on the table were inadequate. Rather than pushing forward with the litigation, strengthening its negotiating position, and

10420671

demonstrating resolve to continue the action and obtain a judgment, U.S. Bank rolled over for

Countrywide and Bank of America and agreed to an unconscionably long stay.

17. Worse, U.S. Bank manipulated the legal process—at the Trust's expense—to protect itself. Upon receiving an initial, and concededly inadequate, settlement offer from Countrywide and Bank of America, U.S. Bank commenced a trust instruction proceeding in Minnesota that sought no relief at all, a placeholder action that was tactically filed to try to preempt Ambac's suit to enjoin acceptance of the initial settlement offer. After ultimately agreeing with Ambac that the initial settlement offer was too low and determining to reject it, U.S. Bank refused to lift the stay in the New York action and recommence litigation. Instead, it let the Trust's claims languish while it sought an order from a Minnesota court that would insulate it from liability. All the while, it told a court in this District and the state court in Minnesota that there was no need to decide whether an Event of Default had occurred, even though that simple contractual question would determine the duties U.S. Bank owes to Ambac and other certificateholders.

18. On June 1, 2018, through a motion filing in Minnesota and without any notice to Ambac or other Trust beneficiaries, U.S. Bank revealed that it had accepted the new settlement offer from Countrywide and Bank of America for $94 million. Giving the lie to its previous claim that it required a Minnesota court order to take any action with regard to settlement, U.S. Bank accepted this offer with no court approval and indeed no opportunity for Ambac and other certificateholders to give their views on the offer. U.S. Bank's whipsawing positions give no benefit to the Trust, but instead are a barefaced attempt to prevent any court from ruling on the key legal question of whether an Event of Default has occurred. All the while, legal fees U.S. Bank has spent on the Minnesota proceedings have been borne by Trust

beneficiaries, including Ambac, even though that proceeding seeks no recovery for the Trust's benefit.

19.     Ambac files this action seeking declaratory judgment that an Event of Default has occurred, and damages to compensate Ambac for U.S. Bank's breach of its prudent person and fiduciary duties, including by baselessly staying the New York action, initiating a wasteful trust instruction proceeding in Minnesota, and accepting a settlement with Countrywide and Bank of America that deprives the Trust of hundreds of millions of dollars in value.

20.     Ambac also seeks redress for U.S. Bank's incorrect accounting for recoveries received by the Harborview 2005-10 Trust, which has resulted in Ambac receiving less than it is due under the Trust's governing agreement.  The implications of U.S. Bank's incorrect accounting will be magnified when any settlement payment is deposited in the Trust. Accordingly, Ambac seeks damages for the harm it has suffered as a result of U.S. Bank's prior improper treatment of recoveries and a declaratory judgment that would correct U.S. Bank's accounting for future recoveries.

## PARTIES

21.     Defendant U.S. Bank is a national banking association, organized and existing under the laws of the United States, with its main office designated by its Articles of Association in Cincinnati, Ohio.

22.     Plaintiff Ambac is a Wisconsin-domiciled stock insurance corporation authorized to transact surety and financial guaranty insurance.  Ambac Assurance Corporation maintains its principal place of business in New York, New York.

10420671

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

25.     This Court has personal jurisdiction over U.S. Bank because U.S. Bank has offices and regularly transacts or transacted business within the state, and it engaged in purposeful conduct within the state by signing a contract that created a New York common law trust, governed by New York law, and by assuming the duties as Trustee of that New York trust. Further, the facts giving rise to this case arise in part from U.S. Bank's prosecution of a suit in a New York Supreme Court.

## FACTUAL ALLEGATIONS

### I.      The Harborview 2005-10 Trust

26.     This action concerns Harborview 2005-10, an RMBS trust originally backed by 4,484 first lien mortgage loans originated by Countrywide with an aggregate principal balance of approximately $1.75 billion.  RMBS certificates, including, on information and belief Harborview 2005-10 certificates, regularly trade in New York and many certificateholders reside in New York.  U.S. Bank is the Trustee of the Harborview 2005-10 Trust.  Ambac issued the Policy covering the Class 1-A1B and Class 2-A1C1 certificates (the "Insured Certificates").

27.     Like all RMBS transactions, Harborview 2005-10 aggregates a pool of mortgage loans and issues securities backed by the cashflows from those mortgage loans to investors, known as certificateholders.  By purchasing certificates issued by the Trust,

9

certificateholders acquire rights to the cashflow generated by the payments made by borrowers of the mortgage loans.  Certificates are divided into classes or tranches, with each class of certificates entitled to a different payment priority.  To decrease the risk to certificateholders of a shortfall of mortgage payments to the trust, and therefore to make the certificates more marketable, some RMBS securitizations include a financial guaranty insurance policy.  Under such a policy, the certificate insurer agrees, in exchange for premiums, to make specified payments of principal and interest to insured certificates in the event the cashflows from the underlying mortgage loans are insufficient.

28.     The credit quality and characteristics of the mortgage loans backing the Trust are therefore of the utmost importance to certificateholders and to Ambac as Certificate Insurer.  The quality of the mortgage loans depends on, among other factors, how the loans were originated, the underwriting guidelines used to approve the loans, the originator's compliance with those underwriting guidelines, the quality and value of the mortgaged properties, and compliance with applicable laws.  To assure the Trustee, Ambac, and investors of the quality and characteristics of the mortgage loans deposited in the securitization, Countrywide made dozens of representations and warranties about the mortgage loans, which U.S. Bank as Trustee is responsible for enforcing.

29.     Harborview 2005-10 is governed by a series of interrelated contracts. First, Countrywide, as seller and servicer, sold and assigned its interest in the mortgage loans to Greenwich Capital Financial Products, Inc. ("GCFP") pursuant to a Master Mortgage Loan Purchase and Servicing Agreement ("MMLPSA"), dated April 1, 2003, as amended on November 1, 2004.[1]

---

[1] The PSA refers to the MMLPSA as the Servicing Agreement or the Purchase Agreement.

30.     In section 7.02 of the MMLPSA, Countrywide made numerous representations and warranties about the loans being assigned (the "Loan-Level Warranties"), including that

- each loan was underwritten generally in accordance with Countrywide's underwriting guidelines in effect at the time of origination;

- no fraud was committed by Countrywide in the origination of the loans and, to the best of Countrywide's knowledge, no fraud was committed by the borrower or any other person involved in the loan's origination;

- the origination practices used by Countrywide "have been in all respects legal, proper, prudent and customary" and Countrywide "ha[d] no knowledge of any circumstances [] or condition" with respect to the loan "that can reasonably be expected to cause the Mortgage Loan to become delinquent"; and

- the information contained in the Mortgage Loan Schedule was "complete, true and correct."

31.     The MMLPSA also sets forth the remedies for Countrywide's breach of any of its representations and warranties.  If Countrywide discovers or is given notice of a breach of a Loan-Level Warranty that materially and adversely affects the value of the related mortgage loan, and such breach cannot be corrected or cured within 90 days, Countrywide must repurchase the loan at the Repurchase Price specified in the MMLPSA.  MMLPSA § 7.03.

32.     To effectuate the Harborview 2005-10 transaction, GCFP conveyed a pool of loans acquired under the MMLPSA to Greenwich Capital Acceptance, Inc. (the "Depositor") through a Mortgage Loan Purchase Agreement ("MLPA") dated as of August 1, 2005.  The Depositor then conveyed the loans to the Trust through a Pooling Agreement ("PSA") dated as of August 1, 2005 between the Depositor, GCFP and U.S. Bank.  The PSA is governed by New York law.  PSA § 12.04.

10420671

33.     Countrywide's representations and warranties, as well as the right to enforce remedies for breach, were assigned to the Trustee for the benefit of the Trust through the MLPA and the PSA.  MLPA § 2.01; PSA § 2.01(a).  Countrywide also restated its representations and warranties contained in the MMLPSA for the benefit of the Trust in a Reconstituted Servicing Agreement ("RSA") dated as of August 1, 2005.  Also in the RSA, Countrywide acknowledged the assignment to U.S. Bank of the right under the MMLPSA to enforce Countrywide's obligations, including its obligation to cure or repurchase noncompliant loans.  The RSA is governed by New York law.  RSA at 5.

34.     Ambac agreed to issue an irrevocable financial guaranty insurance policy to Class 1-A1B and Class 2-A1C1 certificateholders pursuant to a Commitment Letter between Ambac and Greenwich Capital Markets, Inc. dated August 31, 2005.  The Policy was issued concurrently with the closing of the transaction.

35.     As Certificate Insurer, Ambac is an express third-party beneficiary of the PSA.  PSA § 12.10.  In addition, the PSA and the Policy issued by Ambac provide that Ambac is subrogated to the rights of the insured certificateholders and has the right to exercise all rights of the holders of insured certificates under the PSA.  PSA §§ 4.05(d), 12.03.

36.     The contracts establishing Harborview 2005-10 thus establish the basic risk allocation with respect to the Trust.  To the extent Countrywide sold defective loans for inclusion in the Trust, neither Ambac nor certificateholders bear any increased risk from those loans remaining in the Trust; that risk remains with Countrywide.  Countrywide's representations and warranties, and its corresponding promise to cure or repurchase breaching loans, were material to the Trust's formation and material to assessing the risk associated with the mortgage loans backing the certificates.

10420671

## II.     U.S. Bank's Obligations as Trustee of Harborview 2005-10

37.     U.S. Bank's obligations and duties as Trustee of Harborview 2005-10 are established under the PSA and New York common law.  In exchange for promising to fulfill these duties, U.S. Bank is compensated under the PSA by receiving a monthly fee calculated as a percentage of the outstanding principal balance of the mortgage loans.  *See* PSA § 8.05.  The PSA provides that U.S. Bank will administer the Trust out of its offices in Boston, Massachusetts.  PSA § 1.01 (definition of "Corporate Trust Office").

38.     First and foremost, U.S. Bank has an obligation to acquire and protect the Trust Fund for the benefit of all certificateholders.  *See* PSA §§ 2.01(a), 2.02.  U.S. Bank declared that it "holds or will hold all other assets included in the definition of 'Trust Fund' in trust for the exclusive use and benefit of all present and future Certificateholders."  PSA § 2.02.  The assets in the Trust Fund include the mortgage loans as well as all of the rights conveyed to the Depositor under the MLPA, including the right to enforce Countrywide's repurchase obligations.  PSA § 1.01.

39.     Pursuant to the PSA, U.S. Bank has the authority and the obligation to enforce Countrywide's obligation to cure or repurchase loans that breach Countrywide's Loan-Level Warranties.  Section 2.03(a) of the PSA provides that

> Upon its discovery or receipt of written notice . . . of the breach by [Countrywide] of any representation, warranty or covenant under the [MMLPSA] in respect of any Mortgage Loan which materially and adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify [Countrywide] of such defect, missing document or breach . . . and if [Countrywide] does not deliver such missing document or cure such defect or breach in all material respects during such period, *the Trustee shall enforce [Countrywide's] obligation under the [MMLPSA] and cause [Countrywide] to repurchase that Mortgage Loan from the Trust Fund* at the Repurchase Price (as

10420671

defined in the Purchase Agreement) on or prior to the
Determination Date following the expiration of such 90 day period.

(Emphasis added.)

40.     Moreover, U.S. Bank was aware that Countrywide's representations and warranties—and U.S. Bank's promise to enforce those representations and warranties—were fundamental elements of the transaction.  Indeed, rights to enforce Countrywide's repurchase obligations are expressly defined by the PSA to be part of the Trust Fund that U.S. Bank must maintain for the benefit of the Trust, the Certificateholders, and Ambac.

41.     At all times, U.S. Bank has a non-waivable duty to avoid conflicts of interest.  That is, it cannot put its own individual interests above those of the Trust or Trust beneficiaries.  And at all times, U.S. Bank owes a duty to Trust beneficiaries to carry out its duties under the PSA, including its duty to enforce Countrywide's obligations, with due care.  U.S. Bank is liable to Trust beneficiaries for any harm arising out of its own negligent action, negligent failure to act, or its own willful misconduct, and is not entitled to indemnification from the Trust fund for any acts undertaken with negligence or willful misconduct.  *See* PSA §§ 8.01, 8.17.

42.     Upon the occurrence of an Event of Default, U.S. Bank assumes heightened duties as a prudent person and a fiduciary.

43.     First, under the PSA, after an Event of Default has occurred, U.S. Bank must "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  PSA § 8.01.

44.     Second, under New York common law, U.S. Bank has an obligation to act prudently following an event of default to secure the basic purpose of the Trust, that is,

protecting the assets of the Trust and ensuring repayment of obligations due to the Trust. Following an Event of Default, U.S. Bank also owes a fiduciary duty to the Trust beneficiaries that requires it to act with undivided loyalty, in the best interest of the Trust, and to avoid any action that would prioritize U.S. Bank's interests at the Trust's expense.

## III.    The New York State Action Against Countrywide

45.    On August 29, 2011, U.S. Bank, in its capacity as Trustee of Harborview 2005-10, filed suit in New York Supreme Court (the "New York Action") against Countrywide, Bank of America Financial Corporation, Countrywide Financial Corporation, Bank of America, N.A., and NB Holdings Corporation, commencing *U.S. Bank National Association v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. N.Y. Cty.).[2] *See* Compl., NYSCEF No. 2. The Complaint alleged that Countrywide had breached numerous Loan-Level Warranties. U.S. Bank also alleged that Bank of America was secondarily liable for Countrywide's breaches based on the legal theories of de facto merger and mere continuation.

46.    As alleged in the New York Action, beginning in late 2010, a certificateholder instructed U.S. Bank to request loan files from Countrywide and retained a reunderwriting consultant to review a sample of defaulted loans. Fourth Am. Compl. ¶¶ 60-61; *see* Apr. 23, 2014 Aff. of Elizabeth Chen, NYSCEF No. 172. The reunderwriting review found breaches of Loan-Level Warranties in 520 of the sampled loans. *Id.* ¶ 63. After receiving these results, U.S. Bank provided written notice to Countrywide of the breaches, including detailed descriptions of each breach. *Id.* ¶ 75. Specifically, U.S. Bank gave Countrywide notice of

---

[2] The case briefly proceeded in federal court after a notice of removal was filed on September 6, 2011, but was later remanded back to New York state court. *See* Notice of Removal, NYSCEF No. 7; Order re Mot. to Remand, *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 2:12-CV-01066 (C.D. Cal. Apr. 5, 2012), ECF No. 39. NB Holdings Corporation was removed from the case in subsequent pleadings. *See* Stipulation and Order Regarding Fourth Am. Compl. and Successor Liability Allegations ¶ 2 (Sept. 16, 2016), NYSCEF No. 369.

10420671

breaching loans and demanded that Countrywide cure the breaches or repurchase the mortgage loans within 90 days of receiving notice as summarized in the following table:

| Date | No. of Breaching Loans in U.S. Bank Notice to Countrywide | Expiration of 90-Day Cure Period |
|---|---|---|
| May 6, 2011 | 58 | July 31, 2011 |
| May 13, 2011 | 92 | Aug. 10, 2011 |
| May 19, 2011 | 36 | Aug. 17, 2011 |
| May 25, 2011 | 30 | Aug. 23, 2011 |
| June 2, 2011 | 32 | Aug. 31, 2011 |
| June 16, 2011 | 65 | Sept. 14, 2011 |
| Aug. 4, 2011 | 163 | Sept. 14, 2011 |
| Aug. 23, 2011 | 44 | Nov. 17, 2011 |

*Id.* ¶¶ 75-76.

47.     In addition, on June 13, 2016, the Trustee served a breach notice that identified 842 breaching loans (including the loans identified in the 2011 breach notices) and, based on a finding of a breach rate of 87% in a representative sample of liquidated loans, demanded that Countrywide compensate the Trust for 87% of all previously unidentified liquidated loans.  *Id.* ¶¶ 17, 81-84.  As of the date of the Fourth Amended Complaint, September 20, 2016, Countrywide had not repurchased the loans identified in U.S. Bank's breach notices. *Id.* ¶ 66.

48.     U.S. Bank also alleged that, independent of receiving breach notices, Countrywide had discovered breaches of Loan-Level Warranties through its origination and review of the securitized loans.  *Id.* ¶¶ 50-58.

49.     Through a series of decisions on motions to dismiss and motions to amend the pleadings, the New York Supreme Court issued a number of key rulings in the case.  First, it

denied Countrywide's motion to dismiss on the grounds that the complaint failed to state the claim for breach of Loan-Level Warranties with particularity.  May 29, 2013 Decision and Order at 10-11, NYSCEF No. 36.  Second, the Court denied the motion to dismiss claims based on Countrywide's independent discovery of breaches, holding that "allegations that Countrywide discovered breaches on its own trigger the repurchase requirement and obviate any requirement that Plaintiff provide notice of any breach."  Nov. 13, 2014 Decision and Order at 6-8, NYSCEF No. 269.  With this ruling, the Court permitted U.S. Bank to present proof that Countrywide had discovered breaching loans throughout the Trust, not just in the loans which were specifically identified in breach notices.

50.     In the New York Action, U.S. Bank alleged that Bank of America is secondarily liable for Countrywide's repurchase obligations.  The judge presiding over the New York Action has already issued a favorable ruling in a similar RMBS case brought by Ambac against Countrywide related to a different group of RMBS trusts.  There, the same judge denied Bank of America's motion for summary judgment on successor liability claims and granted Ambac's motion for summary judgment on choice of law and the continuity of ownership element of the de facto merger doctrine.  *See Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, No. 651612/2010 (N.Y. Sup. Ct. N.Y. Cty. Oct. 22, 2015), *aff'd in part and modified in part*, 151 A.D.3d 83 (1st Dep't 2017).

51.     Fact discovery is now complete in the New York Action, and the parties exchanged expert reports on reunderwriting in 2016.  *See* July 13, 2016 Status Conference Order at 6, NYSCEF No. 378.  The parties agreed to delay exchanging expert reports on successor liability until the First Department ruled on successor liability issues between Bank of America and Countrywide in the case brought by Ambac cited above.  *Id.* at 7.

## IV.    The Event of Default

52.    As described above, U.S. Bank has heightened obligations after the occurrence of an Event of Default.  U.S. Bank, and its Responsible Officers, as defined in the PSA, have had actual knowledge of the occurrence and continuance of an Event of Default since at least August 29, 2011, when the New York Action was filed.

53.    The Harborview 2005-10 PSA adopts the definition of Event of Default in the MMLPSA.  PSA § 1.01.  Under section 14.01(ii) of the MMLPSA, an Event of Default occurs upon the "failure on the part of [Countrywide] duly to observe or perform in any material respect any other of the covenants or agreements on the part of [Countrywide] set forth in this Agreement which continues unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to [Countrywide] by the Purchaser or by the Custodian."

54.    Beginning on May 6, 2011, U.S. Bank sent Countrywide a number of written demands to repurchase breaching mortgage loans in accordance with Countrywide's obligations under section 7.02 of the MMLPSA.  The 90-day period afforded Countrywide under the MMLPSA to cure the breach or repurchase the mortgage loans from the Trust has now elapsed on each of U.S. Bank's demands.  Countrywide has therefore failed to "duly to observe or perform in [a] material respect" a "covenant[] or agreement[]" of Countrywide under the MMLPSA.

55.    In its Complaint filed on August 29, 2011, and in subsequently filed Amended Complaints, U.S. Bank gave Countrywide written notice that it had failed to comply with its obligations under the MMLPSA, and that its noncompliance had continued unremedied for a period of 30 days.

56.     To date, Countrywide has not repurchased the loans identified in U.S. Bank's demand letters, the loans identified as breaching in U.S. Bank's expert reports, or the loans that Countrywide independently determined breached Loan-Level Warranties. Accordingly, an Event of Default under the MMLPSA and PSA has existed since at least August 29, 2011, and remains unremedied through today.

57.     U.S. Bank and its Responsible Officers, as defined in the PSA, have actual knowledge of the occurrence and continuance of the Event of Default.  It was U.S. Bank—acting through its Responsible Officers—that sent breach notices to Countrywide.  And, through its litigation counsel supervised by the same Responsible Officers, U.S. Bank has been prosecuting the New York Action based on its allegations that Countrywide violated its obligations under the MMLPSA on a massive scale, and refused to remedy those violations when it received a demand from U.S. Bank to do so.

58.     Moreover, on information and belief, an Event of Default likely existed even earlier.  Pursuant to section 2.02 of the PSA, U.S. Bank, or the Custodian acting on its behalf, was required to "review each Mortgage File delivered to it" and to issue an interim and final certification accompanied by a document exception report.  In the final certification, due 180 days after closing, U.S. Bank, or the Custodian on its behalf, certified that (i) for those loans specifically identified on the mortgage loan schedule, there was full and complete loan documentation in accordance with the requirements of the PSA; and (ii) for those loans identified on the document exception report, U.S. Bank had not obtained complete required documentation.

59.     U.S. Bank, or the Custodian acting on its behalf, had a duty to identify in the final certifications and exception reports any mortgage files that were missing documentation required to be delivered under the PSA.  Such documents typically include

19

documents sufficient to prove ownership of the note and mortgage or otherwise protect title.
Given the duties to review the mortgage file and identify missing documents in the
exception reports, U.S. Bank knew of numerous instances where it did not receive (i) the
original mortgage note with all intervening endorsements showing a complete chain of
endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note
affidavit and a duly executed assignment of mortgage for each loan that was not a MERS
loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the
original mortgage for those loans that were MERS loans; and/or (iv) the original recorded
assignment or assignment of the mortgage together with all interim recorded assignments
and the original lender's title policy.

60.     An Event of Default therefore occurred shortly after 180 days after the
final exception reports were delivered for each of the Trusts because Countrywide failed to
cure or repurchase the loans that were identified by U.S. Bank as not having the
contractually required documentation.  U.S. Bank had the ability, obligation, and duty, to
provide notice to Countrywide of such breaches under the PSA and under common law
principles of good faith and its extra-contractual duties to exercise due care.  To the extent
that U.S. Bank knew of and failed to give Countrywide notice of these breaches, it cannot
hide behind this failure to give notice as a justification for the absence of an Event of
Default.

## V.     The Initial Settlement Offers and Ensuing Litigation

61.     On December 16, 2016, U.S. Bank distributed a notice to
certificateholders and to Ambac informing them that on December 7, 2016, it had received a
written offer of settlement from Countrywide and Bank of America (the "First Settlement

Offer").  U.S. Bank received the proposed settlement from a small group of certificateholders referred to as the Initiating Parties.

62.     The First Settlement Offer provided for Bank of America and/or Countrywide to make a one-time payment to the Trust of $56.9 million, which the Initiating Parties represented to be equal to 15% of the estimated lifetime losses of the Countrywide loans in the Trust.  (As of May 25, 2018, the most recent Trust remittance report, the Trust has suffered cumulative realized losses of $373.6 million, and more losses are likely to occur in the future as loans continue to default.)  The First Settlement Offer was reached after a mediation between the Initiating Parties, Bank of America, and Countrywide—but, importantly, not U.S. Bank.   And while the First Settlement Offer did not take into account the millions of dollars in legal fees and expenses the Trust had incurred in prosecuting the litigation, it included a guaranteed payment of over $1.5 million to the Initiating Parties' counsel.  When it notified Ambac and certificateholders of the First Settlement Offer, U.S. Bank said it "ha[d] not yet decided how to proceed."

63.     On January 20, 2017, Ambac filed suit in the Southern District of New York seeking to enjoin U.S. Bank from accepting the First Settlement Offer in violation of its obligations to act as a prudent person and a fiduciary or, alternatively, to recover damages stemming from its acceptance.  Ambac alleged that an Event of Default had occurred on the Trust, imposing heightened duties on U.S. Bank to exercise its independent judgment to evaluate the settlement offer.  Ambac also alleged that U.S. Bank had been improperly accounting for Trust recoveries.  The case, captioned *Ambac Assurance Corporation v. U.S. Bank, National Association*, No. 17-cv-446 (S.D.N.Y.) ("*U.S. Bank I*"), was assigned to the Honorable Sidney H. Stein.

64.     After Ambac, in its complaint in *U.S. Bank I*, and other certificateholders protested the low amount of the First Settlement Offer and the windfall of attorneys' fees to counsel for a select group of certificateholders, Countrywide and Bank of America unilaterally increased the settlement offer to include up to $10 million to reimburse the Trust for attorneys' fees incurred in enforcing breaches of representations and warranties.  This settlement offer (the "Second Settlement Offer") was announced to certificateholders via a notice dated February 16, 2017.  In that notice, U.S. Bank stated that it "ha[d] not yet decided how to proceed" with respect to the Second Settlement Offer.  Ambac amended its complaint in *U.S. Bank I* to address the Second Settlement Offer.

65.     On March 6, 2017, three weeks after receiving the Second Settlement Offer and approximately six weeks after Ambac filed its complaint in *U.S. Bank I*, U.S. Bank commenced a trust instruction proceeding in Minnesota state court, *In re Harborview Mortgage Loan Trust 2005-10*, No. 27-TR-CV-17-32 (Minn. Dist. Ct.) (the "Minnesota TIP").  In its Petition initiating the Minnesota TIP, U.S. Bank stated that it "ha[d] not made any decision whether to accept or reject" the Second Settlement Offer, but that it "intend[ed] to file an amended petition" once it had made a decision, and to seek the Minnesota court's approval of its yet-to-be-determined choice.

66.     U.S. Bank then asserted in *U.S. Bank I* that the Minnesota TIP required the S.D.N.Y. Court to abstain from ruling on Ambac's claims under *Colorado River Conservation District v. United States*, 424 U.S. 800 (1976).  In a motion to dismiss decision issued on June 6, 2017, Judge Stein rejected that argument, holding that the Minnesota TIP was not a parallel state court proceeding because Ambac was not a party to the Minnesota TIP and because the

Minnesota TIP did not seek a ruling on whether an Event of Default had occurred. *U.S. Bank I*, June 1, 2017 Tr. at 14:11-15:6.

67.     While *U.S. Bank I* proceeded in this Court, Ambac filed a motion to dismiss the Minnesota TIP for lack of jurisdiction.  Ambac argued that a Minnesota court could not assume *in rem* jurisdiction over the Trust consistent with either Minnesota law or constitutional due process because the Trust had insufficient connections to the forum.  Ambac argued that, among other things, the Trust *res*, the mortgage loans, were evidenced by documents held outside the state; the Trust was a New York common law trust governed by New York law, whose governing documents were negotiated in New York; and that those governing documents expressly provided that the place of trust administration would be in Boston, Massachusetts. Ambac also argued that the Minnesota court lacked subject matter jurisdiction over the proceeding under the Minnesota statute authorizing trust instruction proceedings.  The statute only permits corporate trustees to file trust instruction proceedings if they are "located" in the state, and U.S. Bank, by virtue of its registered main office in Cincinnati, is located in Ohio.  The Minnesota trial court denied Ambac's motion to dismiss, and Ambac appealed to the Minnesota Court of Appeals.  The appeal has not yet been decided and, in the interim, no substantive activity has taken place in the Minnesota TIP.

68.     Just days after Judge Stein denied U.S. Bank's motion to dismiss in *U.S. Bank I*, U.S. Bank filed a First Amended Petition in the Minnesota TIP.  In the First Amended Petition, U.S. Bank stated that it intended to reject the Second Settlement Offer, if the Minnesota court approved its decision.  U.S. Bank self-servingly urged the Minnesota court *not* to decide whether an Event of Default had occurred, or what duties such an occurrence would impose on a trustee evaluating a settlement in U.S. Bank's position.  U.S. Bank's First Amended Petition did

not grapple with Ambac's allegations in *U.S. Bank I* that, under a prudent person and fiduciary standard, U.S. Bank was required to make an independent determination of whether accepting the Second Settlement Offer was in the best interest of the Trust and consistent with U.S. Bank's obligations to protect the Trust's assets.

69.     The First Amended Petition alleged that U.S. Bank's decision to reject the Second Settlement Offer was based on its conclusion that the compensation offered was not within a reasonable range of settlements.  First, U.S. Bank had conducted a solicitation of Trust beneficiaries to determine their views on the settlement offer.  As part of that solicitation, U.S. Bank required that beneficiaries identify whether they had any corporate affiliation with Countrywide or Bank of America, the settling defendants.  Through the solicitation, U.S. Bank learned—apparently for the first time—that 61% of the Voting Rights[3] in the Trust were controlled by affiliates of Bank of America or Countrywide.  U.S. Bank conducted a tabulation excluding those votes from the tally, a tacit recognition of the impropriety of allowing Countrywide and Bank of America to vote on a settlement with themselves.

70.     U.S. Bank recognized another anomaly in the definition of Voting Rights in the PSA that made it an inappropriate means for canvassing certificateholder views on a proposed settlement.  The definition of Voting Rights is based on the current face value of certificates so that certificates whose face value has been reduced to zero because of collateral losses in Trust have *no* contractually defined Voting Rights.  *See* PSA § 1.01 (definition of "Voting Rights").  The practical effect is that a solicitation of only those certificateholders with

---

[3] "Voting Rights" is a contractually defined term.  Under the PSA, 98% of the Voting Rights are apportioned among the Classes of Regular Certificates (other than the Class X Certificates) based upon Class Certificate Principal Balances as of any given Voting Record Date, and the remaining 2% of the Voting Rights are allocated to the Class X Certificates and the Class A-R Certificates.  PSA § 1.01 (definition of "Voting Rights").  Ambac controls the Voting Rights for insured classes of certificates.  *See* PSA § 12.03.

Voting Rights would exclude certificateholders who have suffered the gravest losses due to Countrywide and Bank of America's breaches of contract, and who have the most to gain from a fair settlement of the Trust's claims.  At the same time, certificateholders in the most senior classes, whose certificates had not been entirely written off, would have an incentive to vote in favor of a settlement that would make their certificates whole, even if such settlement did nothing to compensate more junior certificateholders.

71.     Acknowledging that nothing in the PSA required the definition of Voting Rights to govern a solicitation on a settlement agreement, U.S. Bank requested in its solicitation that *all* certificateholders respond, including those who would have Voting Rights but for the fact that their certificates had been written down.   Excluding affiliated holders, and counting the votes of all other certificateholders who responded to the solicitation, 54% of certificateholders voted to reject the Second Settlement Offer.

72.     Second, U.S. Bank retained a valuation expert to evaluate the Second Settlement Offer.  According to U.S. Bank, the valuation expert "closely examined the bases for the breaches of representations and warranties alleged and the defenses to those claims at the loan level, focusing on the work of the re-underwriting experts employed by both the Trustee, as the plaintiff, and the Defendants. The Expert's review included an assessment of the strength of the breach claims at the loan level in terms of the asserted evidentiary basis for the breach claim as well as the materiality of the alleged breach."  Based on that review, the valuation expert concluded that the Initial Settlement Offer fell below a reasonable range of settlement.

73.     Following its determination to rejected the Second Settlement Offer, U.S. Bank moved for reconsideration of its motion to dismiss in *U.S. Bank I*, arguing that Ambac's complaint did not present a justiciable controversy because U.S. Bank was not likely to

imminently accept any settlement offer.  The district court granted U.S. Bank's motion and dismissed Ambac's suit as unripe in an order dated December 6, 2017 and a written memorandum dated January 18, 2018.  *U.S. Bank I*, ECF Nos. 51, 52.  The clerk's judgment was entered on March 5, 2018.  ECF No. 53.

74.     Despite having determined to reject the Second Settlement Offer, U.S. Bank did not recommence litigating the New York Action.  Instead, it requested, no fewer than six times, most recently on April 16, 2018, that the New York state court continue the stay of the action, citing its request in the Minnesota TIP that the Minnesota court approve U.S. Bank's decision to *reject* the Second Settlement Offer.  The New York Action remains stayed today, an unwarranted eighteen-month delay in the Trust's efforts to hold Countrywide and Bank of America responsible for their breaches.

## VI.     The Third Settlement Offer

75.     On June 1, 2018, U.S. Bank filed a Motion for Leave to File a Second Amended Petition in the Minnesota TIP.  That filing revealed that on May 31, 2018, U.S. Bank had already accepted a settlement offer (the "Third Settlement Offer") of $94 million—$84 million in settlement payment and $10 million in litigation expense reimbursement to the Trust—to resolve the New York Action by executing a Trust Settlement Agreement ("Third Settlement Agreement") with Countrywide and Bank of America.  The Third Settlement Agreement provides that it will not become effective until the Minnesota court issues an order in the Minnesota TIP authorizing and directing U.S. Bank to enter into and perform its obligations under the Third Settlement Agreement.  *See* Third Settlement Agreement § 2.01.

76.     Unlike the previous settlement offers related to the Trust, or settlements on other, similar RMBS trusts, U.S. Bank did not provide notice to certificateholders through a holder notice that it had received a settlement offer.  U.S. Bank only provided notice to Trust

26

beneficiaries of the Third Settlement Offer on June 4, 2018, after it had already accepted it.  On information and belief, U.S. Bank's motivation for failing to give certificateholders notice of the Third Settlement Offer and an opportunity to express their views was U.S. Bank's desire to thwart Ambac from seeking to enjoin it from accepting the settlement.

77.     In its proposed Second Amended Petition, U.S. Bank continues to insist that the Minnesota court should not determine whether an Event of Default has occurred under the Trust's governing documents because, according to U.S. Bank, its conduct satisfies "*any* standard of care."  Second Am. Pet. ¶ 44.

78.     The Third Settlement Offer is still woefully inadequate and does not come close to providing fair compensation to the Trust for Countrywide's pervasive breaches of representations and warranties, and no fiduciary looking out for the interests of its beneficiaries would accept it.  As part of the New York Action, U.S. Bank retained an expert to reunderwrite a statistically significant random sample of loans in the Trust.  Fourth Am. Compl. ¶ 14.  That expert found a staggering *87%* of all liquidated loans breached Countrywide's representations and warranties.  *Id.* ¶ 16.  This breach rate is consistent with the evidence that Countrywide systematically abandoned its underwriting guidelines as well as principles of prudent underwriting during the period when the Trust loans were originated.  *See id.* ¶¶ 47-49.

79.     In any RMBS representation and warranty litigation, the breach rate serves as the basis for damages and, therefore, is a necessary component in evaluating a settlement offer against the range of likely outcomes in litigation.  No prudent person would agree to a settlement that represents only 23% of lifetime collateral losses after having found a breach rate of 87%.  This is especially true where U.S. Bank's reunderwriting expert found that breach rate after having the opportunity to review the defendants' rebuttal expert report which presumably

contested that rate.  All litigation presents some uncertainty, which must be accounted for in evaluating a settlement.  But no reasonable assessment of the uncertainty and cost of litigation could justify a trustee operating as a fiduciary and as a prudent person in accepting a settlement that compensates for only 23% of the Trust's losses under such circumstances.  This is particularly the case because the Trustee has a contractual right to recover from Countrywide its attorneys' fees expended in enforcing Countrywide's repurchase obligation, and the Trustee has confirmed that its actual legal expenses exceeded the $10 million litigation expense reimbursement included in the Third Settlement Offer.

80.      Moreover, in the only RMBS representation and warranty case to proceed to trial and judgment, the plaintiff—an insurer like Ambac—was awarded 100% of its claims payments after the Court credited the plaintiff's findings of pervasive breaches.  *See Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013).  In the only other RMBS representation and warranty case to complete trial, involving the MASTR Adjustable Rate Mortgages Trust 2006-OA2, 2007-1, and 2007-3, the Court has not yet issued a final judgment, but in a lengthy post-trial opinion issued a number of rulings in the plaintiff's favor.  *See U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322, 2016 U.S. Dist. LEXIS 119890 (S.D.N.Y. Sept. 6, 2016).  In that case, where U.S. Bank is the trustee prosecuting the suit, it *rejected* a settlement offer of approximately 24% of lifetime estimated losses, concluding that it did not adequately compensate the trusts for their claims.  And in that case, there was no suggestion that U.S. Bank operated under the more exacting "prudent person" standard.

81.      Furthermore, and different from many RMBS claims against now-defunct mortgage companies, there is no risk of U.S. Bank being unable to collect a judgment against Bank of America and Countrywide.  Bank of America has already booked more than $70 billion

in expenses related to resolving claims of misconduct in the origination and/or securitization of mortgage loans, most of it arising out of Countrywide's conduct, living up to its CEO Brian Moynihan's pledge to "clean up" for Countrywide's liabilities.  And U.S. Bank has strong claims that Bank of America is legally obligated to pay for any judgment against Countrywide, particularly given that the judge presiding over the New York Action has already issued favorable rulings on analogous claims.

82.     U.S. Bank also states in the proposed Second Amended Petition that it "decided not to conduct another Certificateholder vote" on the Third Settlement Offer because, according to U.S. Bank, "Certificateholders previously voted in favor of the" lower Second Settlement Offer.  Second Am. Pet. ¶ 40.  This allegation ignores Ambac's claim that, under a prudent person and fiduciary standard, U.S. Bank cannot outsource its obligations to protect the Trust corpus to a certificateholder vote, or to a Minnesota court, or to anyone else:  it must exercise its independent judgment to decide what course of action will bring the greatest benefit to the Trust.

83.     U.S. Bank's reliance on the earlier vote is unreasonable for another reason. That vote was conducted in March 2017, over a year ago.  Certificates in the Trust are freely transferrable, and U.S. Bank has no basis to assume that the owners of certificates today have the same views as the owners of certificates one year ago.  Moreover, the RMBS legal landscape continues to evolve, and U.S. Bank's reliance on an outdated vote cannot possibly take subsequent positive developments into account.

84.     Even if relying on a certificateholder vote—and a stale certificateholder vote at that—could satisfy U.S. Bank's prudent person and fiduciary obligations (and it cannot), the solicitation results from 2017 give no basis to assume that the Third Settlement Offer is

acceptable to certificateholders.  In 2017, when the votes of conflicted affiliated holders were eliminated, and when counting the votes of certificates whose value had been wiped out by Countrywide and Bank of America's misconduct, a majority of certificateholders voted to *reject* the settlement.  Moreover, U.S. Bank's claim that certificateholders can "make their views regarding the [Third Settlement Offer] known" as part of the Minnesota TIP rings hollow when U.S. Bank has already signed on the dotted line.

85.     Despite the fact that the Third Settlement Offer materially undervalues the Trust's claims, U.S. Bank has a number of motivations for accepting it.  From the beginning, U.S. Bank was a reluctant plaintiff in prosecuting RMBS representation and warranty claims, only acting after being prodded by certificateholders.  In the New York Action, the certificateholder that initially provided U.S. Bank with direction and indemnity to pursue litigation has since sold its certificates.  Since early 2015, U.S. Bank has been proceeding to prosecute the litigation without any certificateholder indemnifying it against potential claims, a situation that creates risk for U.S. Bank in its personal capacity (though not for the Trust, which benefits from the ongoing litigation and eventual recoveries).  As a defendant in multiple suits alleging that it breached its duties as an RMBS trustee, U.S. Bank faces real risk in continuing the litigation with no backstop protection.  It would be in U.S. Bank's interest to end the New York Action, even if the resolution were not in the best interest of all certificateholders or of Ambac.

86.     Moreover, U.S. Bank is a defendant in multiple suits in this District and in New York state court asserting that it breached its duties as RMBS trustee, including several that include trusts issued on the Harborview shelf with materially similar contractual language.  A ruling from this Court, or any court, that an Event of Default had occurred under the Harborview

2005-10 governing documents would open U.S. Bank up to liability in other suits and to other investors. U.S. Bank's desire to avoid a ruling on the Event of Default question may be understandable, but it is indisputably inconsistent with its obligation to leave its own personal interests to the side and prioritize the interests of the Trust.

87.     Notably, while the Third Settlement Agreement releases all of the *Trust's* claims against Countrywide and Bank of America as of the agreement's effective date, it does not release claims that *U.S. Bank in its personal capacity* may have against Countrywide and Bank of America under the Trust's governing documents. Third Settlement Agreement § 4.01(e). Specifically, U.S. Bank retains the right to seek indemnification from Countrywide and Bank of America for any third-party suits—including, potentially, this one—brought against U.S. Bank. Thus, rather than bargain for an adequate settlement with Countrywide and Bank of America up front, benefiting all certificateholders, U.S. Bank preferred to accept a lowball settlement and force Trust beneficiaries to bring costly and time-consuming suits against U.S. Bank before U.S. Bank eventually seeks recovery from Countrywide and Bank of America under its personal right to indemnification. (Ambac does not concede that U.S. Bank would be entitled to indemnification under the PSA, which would require, among other things, that U.S. Bank have acted without negligence or willful misconduct. But this provision of the Third Settlement Agreement demonstrates that U.S. Bank was willing to use its bargaining power to preserve its own right to assert an indemnification claim in its personal capacity, rather than obtaining a favorable recovery for the Trust.) These are not the actions of a fiduciary, which is obligated to protect the Trust's assets and prioritize the interests of Trust beneficiaries over its own.

88.     Under the heightened standards imposed by the PSA and New York common law following an Event of Default, U.S. Bank could not consider any of these interests

in evaluating and accepting the Third Settlement Offer.  Its only concern must be in securing the best interests of the Trust and certificateholders, to whom U.S. Bank owes undivided loyalty and whose interests it must hold above its own.

## VII.    Harm to Ambac

89.    U.S. Bank's acceptance of the Third Settlement Offer directly harms Ambac.  As Certificate Insurer, Ambac is responsible for making payments to the Trust for distribution to insured certificateholders when the cashflows from the securitized mortgages are insufficient to make a scheduled principal and interest payment.

90.    Countrywide's systematic breaches of the representations about the quality and creditworthiness of loans included in Harborview 2005-10 has resulted in a pool that is vastly riskier than the pool Ambac agreed to insure.  Ambac has incurred significant harm, and continues to incur significant harm, as a consequence of Countrywide's violation of its obligation to repurchase breaching loans.  Ambac has paid nearly $80 million in claims payments on this single RMBS transaction.

91.    If Countrywide had complied with its contractual obligations to repurchase breaching loans by remitting the contractual repurchase price to the Trustee, Ambac would be made whole through the Trust's "waterfall" of payment distributions, either because claims on the Policy would have been avoided in the first instance, or because the repurchase price paid by Countrywide would have been distributed according to the PSA, entitling Ambac to receive distributions as subrogee of the holders of the insured certificates to the extent of the claims Ambac had paid under the Policy.  *See* PSA § 4.05(d).

92.    Similarly, if Countrywide and Bank of America are ordered by a court to pay damages to the Trustee in an amount equivalent to the repurchase obligations, that sum would be deposited in the Trust and distributed through the waterfall to Ambac and to

certificateholders.  If U.S. Bank had negotiated an appropriate settlement of the Trust's claims, the settlement consideration would likewise go to making Ambac and certificateholders whole.

93.     U.S. Bank's acceptance of an inadequate, unfair, and unreasonable settlement means that Ambac will receive less compensation through the waterfall than it should, while the release of the Trust's claims means that the Trust is forever giving up the right to recover more from Countrywide and Bank of America.  Because Ambac must rely on U.S. Bank to protect its rights under the PSA, any action U.S. Bank takes to compromise those claims directly harms Ambac.

94.     U.S. Bank's agreement to stay the New York Action for over a year further harmed Ambac by diminishing the value of the Trust's claims against Countrywide and Bank of America.  Having decided to reject the Second Settlement Offer, U.S. Bank was obligated to continue to litigate the case so as to preserve the claims' value for trial or future settlement.  Its decision to halt the case just as expert discovery reached completion and the parties prepared for summary judgment and trial did nothing to enhance the value the Trust's claims, and instead signaled weakness and reluctance to see the case through to judgment.  Further, an unwarranted stay of this duration has real consequences for U.S. Bank's ability to successfully prove the Trust's claims.  Witnesses' memories can fade, experts must re-familiarize themselves with the subject matter of opinions formed years earlier, and law firms experience turnover that increases the costs of litigation.  U.S. Bank's refusal to move the case forward is particularly inexplicable where the costs of litigation, including attorneys' fees, are contractually required to be paid by Countrywide and Bank of America.

95.     In addition, U.S. Bank's needless spending on trust instruction proceedings that provide no benefit to the Trust has resulted and will result in additional legal

fees being charged to the Trust.  That further reduces the collateral balance of the Trust assets, harming Ambac.

## VIII.   U.S. Bank's Improper Treatment of Trust Recoveries

96.     Ambac has also been harmed and will be further harmed by U.S. Bank's improper treatment of recoveries received by the Trust.

97.     Under section 5.01 of the PSA, U.S. Bank must distribute "Recoveries" (amounts received in respect of defaulted mortgage loans that have already been liquidated) to certificateholders based on the "Class Certificate Principal Balance" of each class of certificates.

98.     However, prior to such distribution, under section 5.08(a)(i) of the PSA, U.S. Bank must increase (or "write up") the Class Certificate Principal Balances of each class of senior certificates (which includes the Insured Certificates) by the amount of any Recoveries, *pro rata* based on the Realized Loss previously allocated to each class of those certificates.

99.     The PSA makes clear that this writing up of Class Certificate Principal Balances based on Recoveries pursuant to section 5.08 must occur *prior* to the actual distribution of those Recoveries pursuant to section 5.01.  As noted above, Recoveries are distributed based on Class Certificate Principal Balance, a defined term under the PSA.  The definition of "Class Certificate Principal Balance" in turn states that "pursuant to section 5.08, the Class Certificate Principal Balance of a Class of Certificates may be increased up to the amount of Realized Losses previously allocated to such Class, in the event that there is a Recovery[.]"  Thus, the Class Certificate Principal Balance, as of any Distribution Date, that provides the basis for the distribution of Recoveries under section 5.01 is the balance of each class of certificates *after* being written up based on those Recoveries under section 5.08.

100.     U.S. Bank has not been writing up the Insured Certificates and distributing Recoveries according to these terms.  During telephone calls between representatives of Ambac

and U.S. Bank held on December 15, 2016 and January 18, 2017, Ambac advised U.S. Bank that it has come to Ambac's attention that U.S. Bank has been writing up only the balances of the most senior class of Certificates and has failed to write up the balances of the Insured Certificates based on Recoveries, contrary to section 5.08(a)(i) of the PSA.  During the January 18 call, U.S. Bank agreed with Ambac that under the PSA it was required to increase the Class Certificate Principal Balance of each class of senior certificates, including the Insured Certificates, and that it would be issuing revised remittance reports correcting this error.  However, during the call U.S. Bank also stated that it believed that any balance increases based on Recoveries should occur *after* those Recoveries have already been distributed.  As indicated by subsequently issued remittance reports, U.S. Bank has indeed failed to write up the Class Certificate Principal Balance of the Insured Certificates based on Recoveries until after it had already distributed those Recoveries, in plain violation of the PSA.

101.    In addition, U.S. Bank continues to account for Recoveries incorrectly in two other respects.  First, when U.S. Bank issued its corrected remittance report, that report reflected that when U.S. Bank wrote up the Class Certificate Principal Balance of the Insured Certificates, it did so incorrectly based only on the portion of the deferred Ambac policy claims, rather than all Realized Loss allocated to those certificates, as mandated by section 5.08.  Second, U.S. Bank has offset Recoveries against Realized Loss incurred on other loans, which is not contemplated or permitted anywhere in the PSA.

102.    U.S. Bank's failure to correctly account for Recoveries has already caused Ambac harm because it has impacted the amount and timing of insurance claims payments Ambac has paid.  Further, and even more critically, if the Third Settlement Agreement becomes effective, the settlement payment will be passed through to Trust beneficiaries as a Recovery.

Accordingly, if U.S. Bank's improper treatment of Recoveries is not corrected, any settlement payment or judgment will not be distributed correctly and Ambac will lose millions of dollars that it is entitled to receive under the PSA.

103.    In its proposed Second Amended Petition, U.S. Bank declines to raise the question of whether the Class Certificate Principal Balance should be written up before or after Recoveries are distributed.  Instead, it states vaguely that "the Trustee *may* also seek instruction regarding any other relevant issues that *may* arise in connection with the Trust's receipt, administration, and distribution" of the settlement payment.  Second Am. Pet. ¶ 43 (emphases added).  And U.S. Bank fails to address at all the second two distribution errors identified by Ambac.

104.    Accordingly, Ambac seeks damages for any harm it has suffered as a result of U.S. Bank's prior improper treatment of Recoveries and a declaratory judgment that the PSA requires that Recoveries must be accounted for as set forth here in order to avoid further harm when proceeds from the ultimate resolution of the New York Action are received and distributed by U.S. Bank.

## IX.    The No Action Clause Does Not Apply to This Suit Against U.S. Bank

105.    The no action clause in the PSA does not apply to this lawsuit because the claims are brought against U.S. Bank as Trustee, not against a third party.  In addition, the claims are brought directly by Ambac against U.S. Bank, not derivatively on behalf of the Trust.  Under New York law, compliance with a no action clause is excused in a suit brought by trust beneficiaries against a trustee for its own wrongdoing.  Additionally, no action clauses do not apply to claims brought against a trustee for breach of fiduciary duty or other extra-contractual duties.

36

106.     Further, even if demand were required, it would be futile for Ambac to make demand on U.S. Bank as it would be absurd to ask the Trustee to sue itself for its own misconduct.

### FIRST CAUSE OF ACTION
### (Declaratory Judgment)

107.     Ambac realleges and incorporates by reference paragraphs 1 through 106 of this Complaint.

108.     The PSA adopts the definition of Event of Default in the MMLPSA, which provides that an Event of Default occurs upon the "failure on the part of [Countrywide] duly to observe or perform in any material respect any other of the covenants or agreements on the part of [Countrywide] set forth in this Agreement which continues unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to [Countrywide] by the Purchaser or by the Custodian."

109.     U.S. Bank gave Countrywide notice that numerous loans in Harborview 2005-10 breached Countrywide's representations and warranties made under the MMLPSA, as reconstituted by the RSA, and demanded that Countrywide cure or repurchase those loans within the applicable 90-day period.  Countrywide failed to cure or repurchase the loans identified by U.S. Bank.

110.     Countrywide also independently discovered breaches of its representations and warranties under the MMLPSA, as reconstituted by the RSA, obligating it to cure or repurchase breaching loans with 90 days.  Countrywide failed to do so.

111.     Through its Complaint, filed on August 29, 2011, subsequent Amended Complaints, and its expert reunderwriting report submitted in the New York Action, U.S. Bank

gave Countrywide notice that its breaches of the MMLPSA had been unremedied for 30 days. To date, Countrywide has not remedied its breaches of the MMLPSA.

112.    A real and justiciable controversy exists over whether these events resulted in the occurrence and continuance of an Event of Default as defined by the PSA.

113.    Accordingly, Ambac requests a declaration that (i) an Event of Default occurred under the PSA, (ii) such Event of Default has continued to the present, and (iii) U.S. Bank and its Responsible Officers have actual knowledge of the occurrence and continuance of such Event of Default.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

114.    Ambac realleges and incorporates by reference paragraphs 1 through 113 of this Complaint.

115.    Under section 5.08(a)(i) of the PSA, on any Distribution Date, the Class Certificate Principal Balance of each class of senior certificates (including the Insured Certificates) must be increased *pro rata* (based on Realized Losses previously allocated to such certificates) by the amount of any Recoveries received with respect to such Distribution Date. Thereafter, under section 5.01 of the PSA, on such Distribution Date, U.S. Bank must distribute those Recoveries to certificateholders and Ambac as subrogee of the holders of Insured Certificates based on the written-up Class Certificate Principal Balance of each class of certificates.

116.    It is clear under the PSA that, with respect to any Distribution Date, Class Certificate Principal Balance increases pursuant to section 5.08 must occur prior to the distribution of Recoveries under section 5.01.  It is further clear under the PSA that U.S. Bank is

not permitted to offset such Recoveries against current period Realized Losses incurred on other mortgage loans.

117.     In addition, under the PSA, U.S. Bank must write up the Class Certificate Principal Balance of the Insured Certificates based on all Realized Loss allocated to those certificates, not on the portion of the deferred Ambac policy claims.

118.     U.S. Bank has not followed the treatment of Recoveries described above.

119.     A real and justiciable controversy exists over U.S. Bank's treatment of Recoveries under the PSA.  Accordingly, Ambac seeks a declaration that U.S. Bank must account for and distribute Recoveries under the PSA as described herein.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

120.     Ambac realleges and incorporates by reference paragraphs 1 through 119 of this Complaint.

121.     The PSA is a valid contract that establishes U.S. Bank's contractual duties and obligations, in its capacity as Trustee, to the Trust, to Ambac, and to certificateholders.

122.     Ambac is an express third-party beneficiary of the PSA in its own right and as subrogee of insured certificateholders.  Ambac is entitled to enforce U.S. Bank's performance as Trustee.

123.     Under the PSA, upon an Event of Default and while an Event of Default continues uncured, U.S. Bank must exercise the rights and powers vested in it under the PSA and shall exercise the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

10420671

124.    An Event of Default occurred at least as early as August 29, 2011, and remains uncured through the present.  U.S. Bank and its Responsible Officers had and continue to have actual knowledge that an Event of Default occurred and is continuing.

125.    Notwithstanding its heightened duties following an Event of Default, U.S. accepted an unreasonably low settlement with Countrywide and Bank of America on the Trust's behalf, releasing the Trust's valuable claims against Countrywide and Bank of America in exchange for grossly inadequate compensation.  No prudent person managing its own affairs would agree to the settlement proposed by Countrywide and Bank of America.

126.    U.S. Bank further breached its obligations to act as a prudent person managing its own affairs by agreeing to stay the New York Action for over a year and a half, diminishing the value of the Trust's claims against Countrywide and Bank of America, and by filing a wasteful trust instruction proceeding that brought no benefit to the Trust, at the Trust's expense.

127.    U.S. Bank's material breaches of the PSA in accepting a plainly inadequate settlement will directly and proximately cause damage to the Trust and to Ambac by depriving the Trust of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets, which would otherwise benefit Ambac by reimbursing it for past draws on the Policy.

### FOURTH CAUSE OF ACTION
### (Breach of Contract)

128.    Ambac realleges and incorporates by reference paragraphs 1 through 127 of this Complaint.

129.    The PSA is a valid contract that establishes U.S. Bank's contractual duties and obligations, in its capacity as Trustee, to the Trust, to Ambac, and to certificateholders.

10420671

130.    Ambac is an express third-party beneficiary of the PSA in its own right and as subrogee of insured certificateholders.  Ambac is entitled to enforce U.S. Bank's performance as Trustee.

131.    Under section 5.08(a)(i) of the PSA, on any Distribution Date, the Class Certificate Principal Balance of each class of senior certificates (including the Insured Certificates) must be increased *pro rata* (based on Realized Losses previously allocated to such certificates) by the amount of any Recoveries received with respect to such Distribution Date. Thereafter, under section 5.01 of the PSA, on such Distribution Date, U.S. Bank must distribute those Recoveries to certificateholders and to Ambac as subrogee of the holders of Insured Certificates based on the written-up Class Certificate Principal Balance of each class of certificates.

132.    It is clear under the PSA that, with respect to any Distribution Date, Class Certificate Principal Balance increases pursuant to section 5.08 must occur prior to the distribution of Recoveries under section 5.01.  It is further clear under the PSA that U.S. Bank is not permitted to offset such Recoveries against current period Realized Losses incurred on other mortgage loans.

133.    In addition, under the PSA, U.S. Bank must write up the Class Certificate Principal Balance of the Insured Certificates based on all Realized Loss allocated to those certificates, not on the portion of the deferred Ambac policy claims.

134.    U.S. Bank has not followed the treatment of Recoveries described above.

135.    U.S. Bank's material breaches of the PSA by failing to correctly account for Recoveries has caused Ambac harm because it has impacted the amount and timing of insurance claims payments Ambac has paid and deferred.

10420671

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

136.    Ambac realleges and incorporates by reference paragraphs 1 through 135 of this Complaint.

137.    Under New York law, at all times U.S. Bank owes a duty to Trust beneficiaries to avoid conflicts of interest and, after the occurrence of an Event of Default, U.S. Bank owes a fiduciary duty to the Trust and to all certificateholders, which encompasses a duty to exercise all contractually conferred rights and powers in good faith and for the benefit of Ambac and of certificateholders to preserve the assets of the Trust.

138.    An Event of Default occurred at least as early as August 29, 2011, and remains uncured through the present.  U.S. Bank and its Responsible Officers had and continue to have actual knowledge that an Event of Default occurred and is continuing.

139.    U.S. Bank breached its fiduciary duty by failing to protect the rights of the Trust, of Ambac, and of certificateholders by accepting a settlement that gives inadequate compensation for the Trust's claims.

140.    U.S. Bank further breached its fiduciary duty by agreeing to stay the New York Action for over a year and a half, diminishing the value of the Trust's claims against Countrywide and Bank of America.

141.    U.S. Bank also breached its fiduciary duty to avoid conflicts of interest and to prioritize the Trust's interests over its own by filing wasteful trust instruction proceedings that brought no benefit to the Trust, at the Trust's expense.  And U.S. Bank's efforts to avoid a ruling on whether an Event of Default has occurred caused it to settle the Trust's claims without notice to certificateholders, putting U.S. Bank's own interests over the Trust's.

10420671

142.    U.S. Bank's breaches of fiduciary duty in accepting a plainly inadequate settlement, needlessly expending trust funds, and prioritizing its interests over those of the Trust have and will directly and proximately cause damage to the Trust and to Ambac by depriving the Trust of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets, which would otherwise benefit Ambac by reimbursing it for past draws on the Certificate Insurance Policy.

## JURY DEMAND

143.    Ambac demands a trial by jury pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Ambac respectfully prays for the following relief:

A.    A declaration that (i) an Event of Default occurred under the PSA, (ii) such Event of Default has continued to the present, and (iii) U.S. Bank and its Responsible Officers have actual knowledge of the occurrence and continuance of such Event of Default.

B.    A declaration that U.S. Bank must treat Recoveries under the PSA in the manner set forth herein.

C.    An award of all appropriate damages in favor of Ambac and against U.S. Bank for damages sustained as a result of U.S. Bank's breaches of contractual and common law duties, in an amount to be determined at trial, including any applicable pre- and post-judgment interest; and

D.    Any other relief that the Court deems just and proper.

10420671

Dated:      New York, New York
             June 8, 2018

PATTERSON BELKNAP WEBB & TYLER LLP

 /s/ Peter W. Tomlinson
Peter W. Tomlinson
Stephanie Teplin
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
pwtomlinson@pbwt.com
steplin@pbwt.com

*Attorneys for Plaintiff Ambac Assurance Corporation*

44