UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                                          :
AMBAC ASSURANCE CORPORATION,            :
                                                          :
                                   Plaintiff,             :
                                                          :
                  -against-                               :            18 Civ. 5182 (LGS)
                                                          :
U.S. BANK NATIONAL ASSOCIATION,        :            <u>OPINION & ORDER</u>
                                                          :
                                   Defendant.  :
----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

    Plaintiff Ambac Assurance Corp. ("Ambac") brings this action against Defendant U.S.

Bank National Association ("U.S. Bank" or the "Trustee") as Trustee of Harborview Mortgage

Loan Trust 2005-10 (the "Trust"), a residential mortgage-backed securities ("RMBS") trust

backed by loans originated by Countrywide Home Loans Inc. ("Countrywide"). Ambac issued a

financial guaranty insurance policy to the Trust for the benefit of certain certificate holders.

Following the July 17, 2019, Opinion and Order granting in part U.S. Bank's motion to dismiss,

one claim remains: a breach of contract claim alleging that U.S. Bank failed to account correctly

for past recoveries pursuant to the Pooling Agreement, dated as of August 1, 2005 (the

"Agreement").

    U.S. Bank moves for summary judgment, arguing that U.S. Bank properly accounted for

past recoveries based on the plain terms of the contractual provisions with respect to (i) Ambac's

right to repayment of amounts paid on claims under the insurance policy and (ii) the order of

"writing-up" certificate balances prior to distribution. Ambac cross-moves for summary

judgment on contractual interpretation issues only, arguing that those provisions unambiguously

provide for a contrary interpretation in Ambac's favor, and additionally, that the Agreement

unambiguously prohibits U.S. Bank from offsetting recoveries against realized losses.  For the following reasons, the parties' cross-motions for summary judgment are granted in part and denied in part.

## I.     BACKGROUND

Unless otherwise stated, the following facts are undisputed and drawn from the parties' submissions on these motions.

Distributions to Certificate Classes

The Trust was formed through the Agreement, and its assets are primarily a pool of mortgage loans originated by Countrywide.  The Trust issued over twenty classes of certificates. The relevant classes of certificates are the Class 1-A1B and Class 2-A1C1 Certificates, which were insured by Ambac (the "Insured Certificates"), pursuant to a Certificate Guarantee Insurance Policy and an Endorsement (together the "Policy") effective as of August 31, 2005. The Agreement and Policy are governed by New York law.  *See* Agreement § 12.04 at 129 ("Governing Law; Jurisdiction"); Endorsement at 5.  Most of the classes of certificates were assigned a principal balance (the "Original Class Certificate Balance").  Each class of certificates receives monthly distributions based on certain rights to the cash flow generated by borrower payments on the mortgage loans.  The Agreement provides that each class of certificates is entitled to receive a stated amount of interest and principal *pro rata*, provided there are available funds.  These funds are distributed according to Section 5.01 of the Agreement, which dictates the timing and priority by which distributions are made to the various certificate classes (the "Waterfall Provision").  *See* Agreement, § 5.01(a) at 87-91 ("Distributions").  Distributions to senior classes of certificates are prioritized over subordinate classes of certificates and are made until the "Class Certificate Principal Balance" of the applicable senior class is first "reduced to zero."  *See, e.g.*, *id.* § 5.01(a)(i)(B) at 87.

<u>Class Certificate Principal Balances and Realized Losses</u>

The Class Certificate Principal Balance is defined in relevant part as

> [T]he Original Class Certificate Balance as reduced by the sum of (x) all amounts actually distributed in respect of principal of that Class on all prior Distribution Dates, (y) all Realized Losses, if any, actually allocated to that Class on all prior Distribution Dates . . . <u>provided, however</u>, that . . . pursuant to Section 5.08, the Class Certificate Principal Balance of a Class of Certificates may be increased up to the amount of Realized Losses previously allocated to such Class, in the event that there is a Recovery on a related Mortgage Loan.

*Id.* § 1.01 at 17 ("Class Certificate Principal Balance") (emphasis in original). If the Trust experiences losses -- *e.g.*, if the underlying mortgage loans are foreclosed on and liquidated -- the losses are deducted as "Realized Losses" from the outstanding principal balance of such loan. Realized Losses are allocated to the subordinate classes of certificates first and then to the senior classes of certificates. *See id.* § 5.03(b) at 93 ("Allocation of Realized Losses"). When the Trust recovers amounts on loans that were liquidated, these recoveries are applied to the principal balance of classes where "a Realized Loss has been allocated," first to the senior classes of certificates and then to subordinate classes of certificates. *See id.* § 5.08(a) at 100 ("Recoveries").

<u>Ambac's Insurance Policy Issued to the Trust</u>

Under the Policy, Ambac, in consideration of a premium payment, agreed to pay certain amounts when the Trust suffered shortfalls in cash flows from the underlying mortgage loans affecting the Insured Certificates and was unable to pay the scheduled interest and principal amounts. To make a claim for payment, the Agreement requires the Trustee to notify Ambac, no later than two days prior to the Distribution Date, of any "Insured Amount," which the Policy defines as the "Deficiency Amount" for such Distribution Date. *See id.* § 4.05 at 84 ("Certificate Insurance Policy"); Endorsement at 2 ("Insured Amounts"). The "Deficiency Amount," in turn, is defined as any amount of interest or principal due on the Insured Certificates that cannot be

paid from funds available for distribution, as well as "the amount, if any, of any Realized Losses allocable to the Insured Certificates on such Distribution Date (after giving effect to all distributions to be made thereon on such Distribution Date, other than pursuant to a claim on the Policy)."  Endorsement at 1 ("Deficiency Amount"); Agreement § 1.01 at 21 ("Deficiency Amount").  Upon such notice, Ambac would then pay the Insured Amount, and the Trustee is required to distribute the Insured Amounts pursuant to the Waterfall Provision.

The Policy states that Ambac makes claim payments "only upon presentation of an instrument of assignment in form and substance satisfactory to Ambac, transferring to Ambac all rights under such Insured [Certificates] to receive the principal of and interest on the Insured [Certificates].  Ambac shall be subrogated to all the Holders' rights to payment on the Insured [Certificates] to the extent of the insurance disbursements so made."  Policy at 1.  The Policy later provides that the Agreement is the referenced "instrument of assignment."  *See* Endorsement at 4.  The Agreement provides Ambac with a right to repayment of amounts Ambac paid under the Policy.  The parties dispute the type and extent of Ambac's repayment rights.

Upon the payment of Insured Amounts, the Agreement provides that Ambac "will be entitled to be subrogated to any rights of such [certificate holder] to receive the amounts for which such Insured Amount was paid, to the extent of such payment, and will be entitled to receive the Certificate Insurer Reimbursement Amount."  *Id.* § 4.05(d) at 85.  The Certificate Insurer Reimbursement Amount ("CIR Amount") is referred to in the Waterfall Provision, which provides for Ambac's receipt of such amounts after the senior certificate classes are paid but prior to the subordinate certificate classes.  *Id.* § 5.01(iv) at 89.  The CIR Amount is defined as:

> For any Distribution Date, the sum of (a) all amounts previously paid by the Certificate Insurer in respect of Insured Amounts for which the Certificate Insurer has not been reimbursed prior to such Distribution Date and (b) interest accrued on

the foregoing at the Late Payment Rate from the date the Trustee received such amounts paid by the Certificate Insurer to such Distribution Date.

*Id.* § 1.01 at 13-14 ("Certificate Insurer Reimbursement Amount").  The limitations on insured certificate holders' rights are described in the Agreement at Section 12.03:

> By accepting its Insured Certificate, each Holder of an Insured Certificate agrees that unless a Certificate Insurer Default exists and is continuing, the Certificate Insurer shall have the right to exercise all rights of the Holders of the Insured Certificates under this Agreement (other than the right to receive distributions on the Insured Certificates) without any further consent of the Holders of the Insured Certificates . . . .

*Id.* § 12.03 at 128-129 ("Limitation on Rights of Certificateholders").

The Trust experienced losses (including forgiven principal) totaling nearly $380 million, and Ambac has paid approximately $79.2 million in claim payments to the insured certificate holders.  Ambac commenced this action against U.S. Bank on June 8, 2018, alleging that it had failed to fulfill its duties as trustee of the Trust.  The single surviving claim following U.S. Bank's motion to dismiss is Ambac's breach of contract claim as to U.S. Bank's alleged failure to distribute past recoveries in accordance with the Agreement.  The parties filed the instant motions for summary judgment, each asserting that the Agreement's contractual provisions are unambiguous as to whether U.S. Bank properly distributed past recoveries.  At the pre-motion conference, the parties discussed their proposed motions for summary judgment, and the Court allowed summary judgment briefing to proceed on the threshold interpretive issues of the relevant contractual provisions.

## II.     LEGAL STANDARD

### A.  Motion for Summary Judgment Standard

When parties cross-move for summary judgment, a court construes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party."  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (quotation marks

omitted).  Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B.  Principles of Contract Interpretation

On a contract claim, the threshold question is whether the contract is ambiguous.  *See Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (applying New York law). "Whether a contract is ambiguous is a question of law, and courts may not resort to extrinsic evidence to aid in interpretation unless the document is ambiguous."  *Banos v. Rhea*, 33 N.E.3d 471, 475 (N.Y. 2015); *accord CDC Dev. Props. Inc. v. Am. Indep. Paper Mills Supply Co., Inc*., 184 A.D.3d 623, 624 (2d Dep't. 2020).  An ambiguous contract raises a question of fact as to the contracting parties' mutual intent, to be resolved by the trier of fact.  *See Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002); *accord Rhoda v. Rhoda*, 110 N.Y.S.3d 35, 37 (2d Dep't. 2019) ("The resolution of an ambiguous provision, for which extrinsic evidence may be used, is for the trier of fact.").

Under New York law, a contract may not be found ambiguous merely because the parties present alternative interpretations, except where each interpretation is reasonable.  *See Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *accord Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014).  "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent or when specific language is susceptible of two reasonable interpretations."  *Ellington*, 21 N.E.3d at 1003 (citation and quotation marks omitted); *accord Edwards*, 938 F.3d at 12.

Conversely, "[a] contract is unambiguous where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Edwards*, 938 F.3d at 12 (quotation marks omitted).

"[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Nomura Home Equity Loan, Inc., Series 2006–FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017) (quotation marks omitted). "Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements." *Id.*; *accord CDC Dev. Properties, Inc*, 184 A.D. at 624. Courts should be "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include," particularly where "an agreement [was] negotiated between sophisticated, counseled business people negotiating at arm's length." *Global Reinsurance Corp. of Am. v. Century Indem. Co.*, 91 N.E.3d 1186, 1193 (N.Y. 2017) (quotation marks omitted). Rather, courts should read a contract "as a harmonious and integrated whole to determine and give effect to its purpose and intent." *Nomura Home Equity Loan, Inc.*, 30 N.Y.S.3d at 524; *accord Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019) (applying New York law). "Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby." *Kolbe v. Tibbetts*, 3 N.E.3d 1151, 1156 (N.Y. 2013); *accord Abdullayeva*, 928 F.3d at 222.

Under New York law, all writings forming a part of a single transaction are read together. *See BWA Corp. v. Alltrans Exp. U.S.A., Inc.*, 493 N.Y.S.2d 1, 3 (1st Dept. 1985); *accord Wells Fargo Bank, N.A. v. Fin. Sec. Assur. Inc.*, 504 Fed. App'x 38, 40 (2d Cir. 2012) (summary order)

(holding that, under New York law, prospectus supplement and other transaction documents related to pooling and servicing agreement should be considered in interpreting the contract).

## III.    DISCUSSION

The parties cross-move for summary judgment on the interpretation of the Agreement as to Ambac's right to repayment and the order of operations in applying recoveries to -- or "writing up" -- certificate principal balances prior to the distribution of recoveries.  Ambac also seeks a finding on summary judgment that the Agreement unambiguously prohibits U.S. Bank from offsetting recoveries against realized losses.  For the following reasons, the parties' cross-motions for summary judgment are granted in part and denied in part.  Summary judgment is granted to U.S. Bank insofar as the Policy and Agreement together unambiguously provide that Ambac is entitled to be repaid only in the waterfall position designated for the Certificate Insurer.  Summary judgment is granted to Ambac on the remaining two issues -- in that the Agreement unambiguously requires the use of the "write-up" first method and unambiguously prohibits offsetting recoveries with realized losses.

### A.    Ambac's Right to Repayment

The parties cross-move for summary judgment on the issue of Ambac's right to repayment.  Ambac contends that it has two separate rights to repayment, providing it a right to participate at two places in the Waterfall Provision: (1) a right as subrogee to receive distributions of insured certificate holders at their waterfall position and (2) the additional right to receive the CIR Amount in the Certificate Insurer's waterfall position.  U.S. Bank contends that Ambac's right to repayment is limited to the latter, through the mechanism of subrogation. There is no dispute that Ambac is subrogated to the rights of the insured certificate holders. Rather, the issue is whether Ambac's right to repayment through subrogation is contractually limited to the CIR Amount payable lower in the waterfall, or whether the CIR Amount is a

separate contractual right of reimbursement, in addition to a right as subrogee to receive distributions of insured certificate holders at their senior positions in the waterfall. The Trustee has the better argument. The Policy and Agreement together unambiguously provide that Ambac will be repaid only the CIR Amount in the waterfall position designated for the Certificate Insurer.

Subrogation is a principle of insurance law that entitles an insurer to stand in the shoes of the insured. *See, e.g.*, *US Airways, Inc. v. McCutchen*, 569 U.S. 88 n.5, 97 (2013) ("Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against a third party." (quotation marks omitted)); *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999) ("the subrogee is substituted for and succeeds to the rights of another party, known as the subrogor"); 16 Couch on Ins. § 222:5 (defining subrogation as where the subrogee is given "all the rights, priorities, remedies, liens, and securities" of the subrogor). Parties to insurance policies "frequently include subrogation provisions in their policies, in which case their rights must be governed by the terms of the policy." *World Trade Ctr. Props. LLC v. QBE Int'l Ins. Ltd.*, 627 F. App'x 10, 13 (2d Cir. 2015) (summary order); *accord J & B Schoenfeld, Fur Merchs., Inc. v. Albany Ins. Co.*, 492 N.Y.S.2d 38, 41 (1st Dep't 1985) ("Where the right of an insurer to subrogation is expressly provided for in the policy, its rights must be governed by the terms of the policy."); 16 Couch on Ins. § 222:36 ("An insurer's right to subrogation is subject to any limitations, whether express or indirect, contained in the contract of insurance.").

## A. The Policy

The Policy is the sole agreement between Ambac and the Trustee for the benefit of the insured certificate holders. The Policy contains three critical terms regarding Ambac's right to repayment, which are further discussed below:

- Ambac can recoup the insurance payments it makes; *i.e.*, Ambac's right to repayment is limited to the amount Ambac paid. *See* Policy at 1.

- Ambac will be repaid by receiving principal and interest on the insured obligations; *i.e.*, Ambac is repaid by the transfer of the certificate holders' rights to receive principal and interest. *See id*.

- Ambac does not recover its insurance payments unless the full amount of the insured certificate holders' allocable distributions can be made; *i.e.*, the holders of the Insured Certificates get paid first before Ambac. *See* Endorsement at 4.

As to the first of the three critical terms listed above, Ambac does not dispute that its right to repayment is limited by the amount Ambac paid on the insured certificates.

As to the second of the three elements, Ambac's right to repayment is at the heart of the parties' dispute.[1] The Policy provides that the Agreement "transfer[s] to Ambac all rights under such Insured [Certificates] to receive the principal of and interest on the Insured [Certificates]" (the "transfer sentence"). *Id.* at 1. This is immediately followed by, "Ambac shall be subrogated to all the Holders' rights to payment on the Insured [Certificates] to the extent of the insurance disbursements so made" (the "subrogation sentence"). *Id.* By its terms, the subrogation sentence is not independent of the transfer sentence. Rather, the subrogation sentence limits and explains the preceding sentence, for example, by limiting Ambac's right to repayment "to the extent of the insurance disbursements" Ambac made, which is undisputed. This construction suggests that the right of subrogation conferred in the subrogation sentence is similarly a limitation and explanation of Ambac's right to repayment in the preceding sentence. This conclusion is confirmed by the "instrument of assignment" -- *i.e.*, the Agreement -- which is referenced in the

---

[1] For clarity, the relevant language states that Ambac will pay the Insured Amounts to the Trustee. "Such payments of principal or interest shall be made only upon presentation of an instrument of assignment in form and substance satisfactory to Ambac, transferring to Ambac all rights under such Insured [Certificates] to receive the principal of and interest on the Insured [Certificates]. Ambac shall be subrogated to all the Holders' rights to payment on the Insured [Certificates] to the extent of the insurance disbursements." *See* Policy at 1.

same paragraph and provides the mechanism for Ambac's repayment.  The Agreement is discussed below.

As to the third of the three critical terms listed above, the Policy provides that "[t]he Certificate Insurer hereby agrees that if it shall be subrogated to the rights of Holders by virtue of any payment under this Policy, no recovery of such payment will occur <u>unless the full amount of the Holders' allocable distributions for such Distribution Date can be made</u>."  *See* Endorsement, at 4 (emphasis added).  Critically, this provision addresses the priority of payment; Ambac and the Trustee agree that the Holders (defined as the insured certificate holders) will receive their distributions for any particular distribution date first, and then, only to the extent there are funds remaining after such distributions, Ambac receives its repayment.  The plain meaning of "can be made" is that Ambac does not get paid unless funds are available to pay the entire amount of the distribution to the Holders.  This provision is consistent with Ambac's fundamental obligation under the Policy to pay any shortfall of amounts due to be paid to the Holders.  The Trustee cannot pay Ambac first, resulting in a shortfall, as Ambac would need to then pay the amount as insurance.  Only if there are excess funds after the senior certificate holders are paid is Ambac relieved of its insurance obligation and does Ambac get repaid before the junior holders.

The following sentence (the "non-waiver sentence") states that, despite the *priority* by which the Certificate Insurer is subrogated to the rights of the insured certificate holders, the Certificate Insurer retains its right "to seek full payment of all Reimbursement Amounts owed to it [under the Policy or the Agreement]."  Endorsement at 4.  In other words, even though the Certificate Insurer is not subrogated to the insured certificate holders' positions in the Waterfall Provision, the Certificate Insurer is still entitled to be reimbursed to the extent of the Insured Amounts paid.  *See* 16 Couch on Ins. § 222:36 ("An insurer's right to subrogation is subject to any limitations, whether express or indirect, contained in the contract of insurance.").

These provisions give effect to the central purpose of the Policy to protect the senior certificate holders; Ambac provides insurance so the certificate holders are made whole -- by receiving insurance proceeds if there is a shortfall and by getting their distributions first when there is an excess. *See Kolbe*, 3 N.E.3d at 1156 ("[W]hen reviewing a contract particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby" (quotation marks and alterations omitted)).

**B.  The Agreement**

Ambac's and the Trustee's rights and responsibilities are also governed by the Agreement.  Pursuant to the Policy, Ambac agreed to make its payments "only upon presentation of an instrument of assignment in form and substance satisfactory to Ambac." *See* Policy at 1. The Policy expressly states that this instrument is the Agreement.  *See* Endorsement at 2 (definition of "Agreement"), 4 ("The terms and provisions of the Agreement constitute the instrument of assignment referred to in the second paragraph of the face of this Policy").  In other words, the insurance payments that Ambac makes and any money that it recoups are subject to the terms of the Agreement.  Ambac is not a party or signatory to this Agreement but is rather an "intended third-party beneficiary of th[e] Agreement." *See* Agreement § 12.10 at 131 ("Benefits of Agreement").  The Agreement is "in form and substance satisfactory to Ambac," Endorsement at 4, and the parties treat it as an agreement between Ambac and the Trustee.  Indeed, Ambac's breach of contract claim is framed as a breach of the Agreement. Under New York law, all writings forming part of a single transaction are to be "read and interpreted together." *BWA Corp.*, 493 N.Y.S.2d at 3; *accord Wells Fargo Bank, N.A.*, 504 Fed. App'x at 40.  Accordingly, the Agreement is not "extrinsic evidence" and is properly considered on this issue.

Section 4.05 of the Agreement is entitled "Certificate Insurance Policy." In the first three-subsections, it describes the mechanisms by which Ambac pays, and certificate holders receive, insurance proceeds. *See* Agreement § 4.05(a)-(c) at 84. Subsection (d) provides for Ambac's right to receive repayment. Subsection (d) is a single paragraph comprised of three sentences, each dictating separate rights and obligations. The first sentence describes how the Trustee receives and distributes the Insured Amounts paid by Ambac.

The second sentence provides that the "Insured Amounts disbursed by the Trustee . . . shall not be considered payment by the Trust Fund . . . nor shall such disbursement . . . discharge the obligations of the Trust Fund," and the "Certificate Insurer shall become owner of such amounts . . . as the deemed assignee." *Id*. This sentence preserves the Trust Fund's obligation to pay the amounts covered by insurance and provides for the Certificate Insurer's rights as assignee to recoup these amounts paid.

The third and final sentence (the "subrogation" sentence) provides for the repayment to Ambac and reflects all three of the critical repayment terms as set forth in the Policy -- (1) the limitation on the amount of payment to Ambac, (2) the source of that payment, and (3) the priority of payment:

> The Trustee hereby agrees on behalf of the Holders . . . for the benefit of the Certificate Insurer that, to the extent the Certificate Insurer pays any Insured Amount, . . . the Certificate Insurer will be entitled to be subrogated to any rights of such [certificate holder] to receive the amounts for which such Insured Amount was paid, to the extent of such payment, and will be entitled to receive the Certificate Insurer Reimbursement Amount as set forth in Section 5.01 [the Waterfall Provision].

*Id.* (emphasis added). This sentence provides that the Certificate Insurer will be repaid, only to the extent of the Insured Amount paid, through subrogation and provides the priority of payment, by reference to the CIR Amount and the Waterfall Provision. Specifically, the sentence dictates that, per the definition of the CIR Amount and the terms of the Waterfall Provision, on any given

distribution date, Ambac is entitled to what remains of all available funds for that date after payment to the senior certificate holders, up to the amount Ambac has paid and not been reimbursed.  The Waterfall Provision, in turn, provides that the Certificate Insurer receives the reimbursement amount at its position in the waterfall, after the senior certificates.  *See id.* § 5.01(a)(iv) at 89.

In two respects, Section 4.05 unambiguously provides for repayment as described above and does not create a separate reimbursement right apart from a right to be repaid through subrogation.  First, separate rights are provided for in separate sentences -- the second sentence provides for Ambac's right as assignee; the third sentence provides for Ambac's right as subrogee.  Accordingly, all parts of the third sentence should be read together.  The third sentence could have been divided into two sentences if the intent had been to confer on Ambac yet another right to repayment.  Second, the definition of the CIR Amount[2] explicitly contemplates that amounts reimbursed through the waterfall would not occur on the same distribution date, as it includes "all amounts previously paid . . . for which the Certificate Insurer has not been reimbursed <u>prior to such Distribution Date</u>."  *Id.* § 1.01 at 13-14 ("Certificate Insurer Reimbursement Amount") (emphasis added).  Ambac necessarily cannot receive some distributions on the *same* Distribution Date in a more senior waterfall position.

That Ambac does not have a right to repayment through subrogation separate from and in addition to the right to receive the CIR amount is further supported in view of other provisions in the Agreement and reading the Agreement as a whole.  Significantly, Section 12.03, which

---

[2] The "Certificate Insurer Reimbursement Amount" is: "For any Distribution Date, the sum of (a) all amounts previously paid by the Certificate Insurer in respect of Insured Amounts for which the Certificate Insurer has not been reimbursed prior to such Distribution Date and (b) interest accrued on the foregoing at the Late Payment Rate from the date the Trustee received such amounts paid by the Certificate Insurer to such Distribution Date."   Agreement § 1.01 at 13-14 ("Certificate Insurer Reimbursement Amount").

describes the certificate holders' rights vis-à-vis the rights of the Certificate Insurer, confirms

that there is a single right to repayment of the CIR Amount.  It states:

> By accepting its Insured Certificate, each Holder of an Insured Certificate agrees that . . . the <u>Certificate Insurer shall have the right </u>to exercise all rights of the Holders of the Insured Certificates under this Agreement (<u>other than the right to receive distribution on the Insured Certificates</u>) without any further consent of the Holders of the Insured Certificates . . . .  Notwithstanding the foregoing, the Certificate Insurer shall have <u>no power</u> without the consent of the Owner of each Certificate affected thereby <u>to</u>: (i) <u>reduce in any manner the amount of, or delay the timing of, distributions of principal or interest required to be made hereunder</u> . . . .

Agreement § 12.03 at 129 (emphasis added).  This provision provides that Ambac does not have

the right to receive distributions in the waterfall positions of the insured certificate holders, and

instead, Ambac has the right to receive the CIR Amount at the Certificate Insurer's position in

the waterfall.  The Prospectus Supplement confirms the interpretation that Ambac recovers

Insured Amounts only after the senior classes are paid.  *See* Prospectus Supplement at S-8

("Payment Priorities"); *see also Wells Fargo Bank, N.A.*, 504 Fed. App'x at 40 (holding that the

district court properly considered, in interpreting a pooling and servicing agreement, the

prospectus supplement and other transaction documents related to the agreement, as writings

forming part of a single transaction).

The single reference to the Certificate Insurer in the Waterfall Provision is also

significant.  Where the waterfall provides that payments will be made first to the senior

certificate holders, it does not state in the alternative that payment will be made to "the

Certificate Insurer as subrogee."  *See id.* § 5.01(a)(i).  "Courts may not, through their

interpretation of a contract, add or excise terms or distort the meaning of any particular words or

phrases, thereby creating a new contract under the guise of interpreting the parties' own

agreements."  *Nomura Home Equity Loan, Inc., Series 2006-FM2.*, 92 N.E.3d at 748 (internal

citations omitted).  The Agreement expressly references the Certificate Insurer when it means

Ambac, and separately names the certificate holders and Certificate Insurer together when it means both.  For example, the Agreement provides that various parties will make representations and warranties "to the Trustee on behalf of the Certificateholders and the Certificate Insurer," *see* Agreement § 2.04 at 70-71, and recording is for the benefit of "the interests of the Certificateholders and the Certificate Insurer," *see id.* § 12.02 at 128.

Further, many provisions comprehensively govern matters relating to the Certificate Insurer, but there are no provisions related to subrogation as an amount separate from the CIR Amount.  The term "subrogation," or any variant of the term, appears only once in the Agreement, in Section 4.05(d), the section discussed above that Ambac relies on for its argument.  "Courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."  *Global Reinsurance Corp. of Am.*, 91 N.E.3d at 1193.  The provisions comprehensively authorizing payment to anyone under the Agreement do not refer to subrogation.  As they relate to Ambac, the Waterfall Provision refers to the CIR Amounts only, *see* Agreement § 5.01(a) at 87-91, and the provision on permitted withdrawals and transfers from the distribution account contemplates payments of "Aggregate Premium Amount[s]" to the Certificate Insurer, *see id.* § 4.03(a)(xiii) at 82. Similarly, the reporting provisions refer to the Certificate Insurer regarding payments of the "Certificate Insurer Reimbursement Amount, if any" and the "Deficiency Amount, if any, to be paid by the Certificate Insurer."  *See id.* § 5.04(a)(xxix)-(xxx) at 97.  The definitions section, Section 1.01, refers to all amounts relating to the Certificate Insurer -- *e.g.*, the Aggregate Premium Amount, CIR Amount and Deficiency Amount -- but does not include any "Subrogation Amount."  *Id.* § 1.01 at 9-57.  The definitions section consistently uses the term "Amount" to refer to amounts to be paid or used in calculations of payments to anyone -- *e.g.*,

Interest Distributable Amount, Unpaid Interest Shortfall Amount and Principal Deficiency Amount -- but makes no reference to subrogation or a "Subrogation Amount." *Id.*

Accordingly, in view of the Policy and Agreement as a whole, the parties clearly intended and unambiguously provided that Ambac's right to repayment is limited to the CIR Amount, which Ambac receives in its position in the Waterfall Provision, after the senior certificate holders and before the junior certificate holders. And, no other contractual provisions -- nor a general appeal to equitable subrogation principles -- can be understood to overwrite these clear terms. *See Kolbe*, 3 N.E.3d at 1156 ("[W]hen reviewing a contract particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby" (quotation marks and alterations omitted)); *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998) ("Where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement" (quotation marks and alterations omitted)).

Ambac argues that its alleged entitlement to two types of repayments -- a right to distributions through subrogation and a CIR Amount -- is evidenced by the fact that the two rights are not coextensive. Ambac asserts that the subrogation amount is payable (in the certificate holders' place in the waterfall and only to the extent of Ambac's claim payments) *only* if there are subsequent Recoveries that write up the Insured Certificates for the previously incurred losses. Ambac's theory has no support in the language of the Agreement. Nothing in the Agreement or Policy limits Ambac's repayment right via subrogation to participation in the insured certificate holders' entitlement to Recoveries. Recoveries are applied to increase the principal to the extent of past realized losses. *See* Agreement § 1.01 (defining "Principal Distribution Amount" to include Recoveries), at 42. Certificate holders are entitled to

distributions of principal and interest at their place in the waterfall.  *See* Agreement § 5.01(a)(1)

("Available Funds"), at 11.  And, as discussed above, the Certificate Insurer (Ambac) is entitled

to payment at its place in the waterfall.

Ambac relies on the word "and" in Section 4.05(d) of the Agreement to suggest that the

CIR Amount is a separate right, arguing that the provision itself sets forth multiple rights.  As

explained above, "in the light of the obligation as a whole and the intention of the parties

manifested thereby," *Kolbe*, 3 N.E.3d at 1156, the "and" is explanatory, and reading the entire

provision makes clear that the final sentence is intended to explicate Ambac's right to be repaid

through subrogation.

Ambac also relies on the "non-waiver" sentence in the Policy's priority provision as

evidence of its entitlement to two types of payment.  *See* Endorsement at 4.  But as explained

above, this sentence states only that, despite the *priority* by which the Certificate Insurer is

subrogated to the rights of the insured certificate holders, the Certificate Insurer retains its right

"to seek full payment of all Reimbursement Amounts owed to it [under the Policy or the

Agreement]."  *See* Endorsement at 4.

Ambac additionally relies on two cases from this District, one that found that the RMBS

contract at issue was ambiguous as to whether the certificate insurer had a single right to

repayment or separate rights of subrogation and reimbursement, *see Wells Fargo Bank, N.A. v.

Wales LLC*, No. 13 Civ. 6781, 2016 WL 5719761 (S.D.N.Y Sept. 29, 2016), and one that found

the contract to be unambiguous in favor of the certificate holders and against the certificate

insurer, *see Wells Fargo Bank, N.A. v. ESM Fund I, LP*, 785 F. Supp. 2d 188, 196-97 (S.D.N.Y.

2011), *aff'd sub nom. Wells Fargo Bank, N.A. v. Fin. Sec. Assur. Inc.*, 504 Fed. App'x 38 (2d

Cir. 2012) (summary order).  These cases are not persuasive in that they were construing

different terms and contracts.

Accordingly, U.S. Bank's motion for summary judgment is granted on the issue of Ambac's repayment right.  The Policy and Agreement unambiguously provide that Ambac's repayment right based on subrogation is limited to the CIR Amount, paid in the Insurer's position in the waterfall.

### B.       Use of "Write-Up First" Method

The parties also cross-move for summary judgment on the issue of whether the Agreement mandates an order of operations for allocating recoveries and paying principal distributions.  Ambac argues that when the Trust receives recoveries, the Agreement requires the Trustee to increase the Class Certificate Principal Balances and then make monthly distributions (the "write-up first method").  U.S. Bank contends that the Agreement is silent on this issue and that the Trustee did not breach the agreement by making monthly distributions, including recoveries first and then writing up the Class Certificate Principal Balances.  Ambac has the better argument; the Agreement unambiguously requires the write-up first method.

The Agreement provides that, in addition to interest, each senior class of certificates is entitled to monthly distributions until the Class Certificate Principal Balance of that class is reduced to zero.  *See* Agreement § 5.01(a) at 87-91.  To implement this provision, the Trustee must determine the Certificate Principal Balance for each class.  In effect, the Class Certificate Balance is the amount owed (exclusive of interest) on any given Distribution Date as to each class.  The Agreement defines Class Certificate Principal Balance as:

> As to any Distribution Date, with respect to any Class of Certificates . . . the Original Class Certificate Balance as reduced by the sum of (x) all amounts actually distributed in respect of principal of that Class on all prior Distribution Dates, (y) all Realized Losses, if any, actually allocated to that Class on all prior Distribution Dates . . . <u>provided, however</u>, that . . . pursuant to Section 5.08, the Class Certificate Principal Balance of a Class of Certificates may be increased up to the amount of Realized Losses previously allocated to such Class, in the event that there is a Recovery on a related Mortgage Loan . . . .

*Id.* § 1.01 at 17-18 ("Class Certificate Principal Balance") (emphasis in original).  Section 5.08 states, "With respect to any Class of Certificates . . . to which a Realized Loss has been allocated . . . the Class Certificate Principal Balance . . . will be increased, up to the amount of related Recoveries *for such Distribution Date* . . . ."  *Id.* § 5.08(a) at 100 (emphasis added).

These provisions expressly state that the balance due on any given Distribution Date is calculated by taking the original amount due ("Original Class Certificate Balance") and subtracting amounts *previously* paid ("amounts actually distributed" on "prior Distribution Dates") as well as amounts *previously* written off ("Realized Losses actually allocated" for "prior Distribution Dates"); and then adding *current* Recoveries ("Recoveries *for such Distribution Date*" (emphasis added)) related to past Realized Losses.  The resulting amount due ("Class Certificate Principal Balance") is the maximum amount payable on any given distribution date, to be paid under the Waterfall Provision.  "Had the drafters intended to include . . . previous [s]ubsequent [r]ecoveries in the calculation of Certificate Principal Balance and thereby to delay the write-up of such subsequent recoveries, they could have done so, as they did for other principal distributions and losses."  *Wells Fargo Bank v. For Judicial Instructions under CPLR Article 77*, No. 657387/2017, 2020 WL 735683, at *7 (N.Y. Sup. Ct. Feb. 13, 2020) (holding that the write-up first method applies to substantially similar contractual provisions to those here).  Accordingly, pursuant to the unambiguous terms of Sections 1.01 and 5.08 of the Agreement, the write-up first method applies; recoveries are added to the balance for such distribution date to determine the maximum amount payable in the monthly distribution before the distribution is made.

On this issue of the order of operations as to applying recoveries, Ambac's motion for summary judgment is granted and U.S. Bank's motion for summary judgment is denied.

C.      **Offsetting Recoveries Against Realized Losses**

Ambac moves for summary judgment on the issue of whether the Agreement unambiguously prohibits U.S. Bank from offsetting recoveries against realized losses, which it has done in the past and is part of the basis for Ambac's breach of contract claim. Ambac's motion is granted with respect to this issue.

Ambac argues that the Agreement prohibits the Trustee's former practice of offsetting recoveries against realized losses, rather than treating them as two separate amounts that must be accounted for and passed through the waterfall separately. Ambac provides the following example: "[I]f there is a $100 Realized Loss in a given month and a $40 Recovery, U.S. Bank accounted for this as though there were a $60 Realized Loss and $0 Recovery, rather than accounting for each component separately." Ambac Mem. L., Dkt. 90, at 11.

Ambac is correct that the Agreement contemplates that the Trustee must account for recoveries and realized losses as two separate amounts and does not allow for the Trustee to offset the amounts and account for a single net amount only. Two separate sections govern the allocation of realized losses and application of recoveries. With respect to the allocation of losses, Section 5.03 directs the Trustee to allocate realized losses on a distribution date from the related prepayment period, first to the subordinate classes of certificates, and then to the senior classes. *See* Agreement § 5.03 at 93-94. The provision further directs that such allocation be performed "immediately following the distributions made on the related Distribution Date in accordance with the definition of 'Certificate Principal Balance.'" *Id.* With respect to application of recoveries, Section 5.08 directs the Trustee to increase the Class Certificate Principal Balance "up to the amount of related Recoveries for such Distribution Date," first to the senior classes of certificates and then, to the subordinate classes of certificates in pro rata "up to the lesser of Net Realized Losses previously allocated to each such Class . . . and the amount

21

of Recoveries for such Distribution Date." *Id.* § 5.08(a)(i)-(ii) at 100.  No provisions contemplate

that the Trustee may offset recoveries against realized losses and account for that amount only.

*See Nomura Home Equity Loan, Inc.*, 92 N.E. 3d at 748 ("Courts may not . . . add . . . terms . . .

through their interpretation of a contract.").  Offsetting losses from recoveries undermines the

order of priorities explicitly provided for under the Agreement, which benefits the senior classes

by placing them first in line to be allocated recoveries and last in line for losses.

Because the Agreement unambiguously prohibits the use of offsetting or netting

recoveries against realized losses, Ambac's summary judgment motion is granted on this issue.

### D.     U.S. Bank's Affirmative Defenses

In opposition to Ambac's motion, U.S. Bank also argues that Ambac cannot prevail on its

breach of contract claim given U.S. Bank's defenses, including those based on certain

exculpatory provisions of the Agreement, New York's six-year statute of limitations for a breach

of contract claim and the assertion that at a future time "U.S. Bank would be able to prove to a

legal certainty that the sole claim over which the Court exercised jurisdiction never satisfied the

amount in controversy."  U.S. Bank, Reply and Opp. Mem. L., Dkt. No. 94, at 25.

The Court agrees with Ambac that adjudication of these issues is premature, as the instant

motions for summary judgment were limited to the interpretation of the Agreement.  The parties

shall provide proposed next steps to resolve what remains of Ambac's breach of contract claim --

as winnowed by this Opinion.

## IV.    CONCLUSION

For the reasons above, the parties' cross-motions for summary judgment are granted in

part and denied in part.  Summary judgment is granted to U.S. Bank on the issue of Ambac's

repayment rights.  Summary judgment is granted to Ambac on the issues of whether the

Agreement unambiguously requires the use of a write-up method and prohibits offsetting recoveries against realized losses.  The parties' request for oral argument is denied as moot. The parties shall file a letter within two weeks of the filing of this Opinion and Order outlining proposed next steps.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 82 and 89.

Dated: December 7, 2020
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE